**Marc P. Berger**
**Lara S. Mehraban**
**John O. Enright**
**Jorge G. Tenreiro**
**Victor Suthammanont**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-9145 (Tenreiro)**
**Email: TenreiroJ@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
```

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | :    **19 Civ.** |
| | : |
| **- against -** | :    **ECF Case** |
| | : |
| **REGINALD ("REGGIE") MIDDLETON,** | :    <u>**Complaint**</u> |
| **VERITASEUM, INC., and** | :    **Jury Trial Requested** |
| **VERITASEUM, LLC,** | : |
| | : |
| **Defendants,** | : |
| | : |

```
------------------------------------------------------------------- x
```

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against Defendants Veritaseum, LLC and Veritaseum, Inc. (collectively "Veritaseum") and

Reginald Middleton ("Middleton," together with Veritaseum, "Defendants") alleges as follows:

<u>**SUMMARY**</u>

1.      This is an emergency action to stop the Defendants' further dissipation of the

approximately $8 million of investor proceeds that remain from the approximately $14.8 million

they fraudulently raised in 2017 and early 2018 in an offering of digital securities.  Defendants—

a Brooklyn-based self-described financial guru and two companies he controls—raised the $14.8

million by making material misrepresentations and omissions about the unregistered securities

they offered:  digital assets called "VERI Tokens," "VERI," or "Veritas."  Defendants conducted this offering in a so-called initial coin offering ("ICO") that took place from April 25, 2017 to May 26, 2017, and in post-ICO offers and sales (the "Offering").

2.       Among other things, Defendants knowingly misled investors about their prior business venture and the use of offering proceeds; touted outsized—but fictitious—investor demand for VERI; and claimed to have a product ready to generate millions of dollars of revenue, when no such product existed; placed a series of manipulative trades in VERI Tokens to increase their price and to induce investors to buy more tokens; and misappropriated investor assets beginning during the ICO phase of the offering.

3.       From April 25, 2017 to May 26, 2017, Defendants began fraudulently selling VERI in an unregistered offering of 51 million of the 100 million VERI they had minted on the Ethereum blockchain and controlled.  Defendants pegged the value of VERI to the digital asset ether ("ETH") on a 30-to-1 scale, such that investors bought VERI during the ICO phase of the offering at the value of 1/30th of ETH, or $1.60 to $8.  Defendants' Offering continued after the purported end of the ICO, through at least February 2018.

4.       To skirt the federal securities laws' registration requirements, Middleton attempted to refashion VERI variously as "pre-paid fees" or "software," and likened them to gift cards.  In reality, VERI are securities, as the substance of the Offering shows, including, for example, in Middleton's statements that "today's roughly $3.30 purchase of VERI tokens could yield ($3.30 x 5,000%) = $165" and that "purchase of Veritas goes directly to fund" the business.

5.       To induce purchases during the ICO phase of the offering, Defendants told potential investors that Veritaseum had products ready to go to market that would replace brokers, banks, and hedge funds.  Defendants also assuaged concerns that Defendants could

2

"dump" unsold VERI into the market after their purchases by telling investors that unsold VERI would only be for sales to "buy-side institutions."  After the ICO phase, but while they were still selling VERI to investors, Defendants continued to promise to limit their own VERI sales, while touting fictitious deals that had purportedly netted $35 million and were increasing VERI's price.

6.    As Defendants knew or recklessly disregarded, these statements were all false. There were no products "ready to ship" or that would net millions in revenue or replace financial institutions; Defendants did not sell anywhere near the $35 million in VERI they claimed they had sold post-ICO.  Nor did they limit their post-ICO sales to institutional buyers; instead, they were selling the remaining VERI to anyone who would buy it—largely individuals and in the secondary market—and were using VERI to compensate employees, pay debts, and for personal expenses, among other things.

7.    Moreover, after the ICO phase, Middleton placed a series of secret, manipulative trades in VERI on a digital asset platform, artificially increasing VERI's price by approximately 315% during just one day of trading.  He then touted these price increases and returns to VERI holders, stating, for example, that because VERI was "up 33.51x from its April 25th initial sales price [,] [s]ome prescient folk are quite happy."  Middleton also misappropriated for his own personal and undisclosed use at least $520,000 of the amounts raised in the Offering.

8.    The Offering was an illegal offering—there was no registration statement filed or in effect for the offers and sales of VERI, and no exemption from registration applied.

9.    In August 2018, Defendants began purchasing precious metal with the proceeds of the Offering.  These commodities purportedly supported new tokens sold by Defendants called "VeGold," which were redeemable for physical precious metal or for ETH.  Defendants used Offering proceeds to purchase the precious metals indirectly sold to new purchasers.  In

addition, the ETH proceeds from the VeGold sales flowed directly to an account in the name of Middleton at an online digital asset trading platform.

10.    On July 30, 2019, the day Commission staff informed Defendants' counsel that the staff was likely to recommend that the Commission approve the filing of an enforcement action against Defendants, and on July 31, 2019, Defendants moved more than $2 million in remaining Offering proceeds from a blockchain address they controlled into other addresses, and used a portion of those funds to purchase more precious metals.

11.    Commission staff requested, through counsel, that Defendants voluntarily agree not to engage in further dissipation of the Offering proceeds, including through the purchase of precious metals.  Defendants, through counsel, declined the staff's request.

## VIOLATIONS

12.    By engaging in the conduct set forth in this Complaint, Defendants engaged in securities fraud in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and in the unregistered sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].  Middleton also engaged in the manipulation of securities prices in violation of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78*i*(a)(2)].

13.    Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

14.    The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) & (d)(5)].

15.    The Commission seeks, (1) as emergency and preliminary relief: an order (a) freezing Defendants' assets, (b) prohibiting Defendants from destroying or altering documents, and (c) appointing an independent third-party intermediary to secure Defendants' digital assets and directing Defendants to transfer digital assets under their control to an address designated by the intermediary; (2) an emergency order permitting the Commission to conduct expedited discovery; and (3) a final judgment: (a) permanently enjoining the Defendants from engaging in the acts, practices, and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendant Middleton, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; (d) prohibiting Defendants, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in an offering of digital asset securities; and (e) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly or indirectly, have made use of the means or instruments of transportation or

communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

17.    Venue is proper in the Eastern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other things, Middleton resides in this District, conducted much of the activity alleged in this complaint on behalf of the Defendants in this District, and Defendants' false and misleading statements and fraudulent schemes were made to the public at large, including in this District.

## DEFENDANTS

18.    **Middleton**, age 51, resides in Brooklyn, New York. Middleton formed Veritaseum, Inc. in 2014 and Veritaseum, LLC in 2017. He is both companies' sole owner. Middleton is a self-styled financial "guru" who in 2007 began a blog making predictions about publicly-traded companies; he claims to have foreseen the financial crisis and the collapse of Bear Stearns and Lehman Brothers.

19.    **Veritaseum, Inc.,** is a corporation incorporated in New York in 2014.

20.    **Veritaseum, LLC,** is a Delaware limited liability company organized in April 2017, with a principal place of business in New York, New York. Veritaseum, LLC is the de facto successor entity to Veritaseum, Inc.

21.    Middleton dominated Veritaseum, Inc. and Veritaseum LLC such that they were his alter egos at all relevant times.

## RELATED INDIVIDUALS AND ENTITIES

22.    **Employee One,** age 18, has worked for Veritaseum since 2017.

23.    **Investor One,** age 63, resides in Los Angeles, California, and is a public figure. In late June 2017, Investor One loaned $1 million to Defendants' business.

24.     **Veritaseum Assets** ("**Ve Assets**")**,** is a Delaware Limited Liability Company formed in 2018.  Ve Assets appears to be a de facto successor entity to Veritaseum LLC, advertising the same products advertised for both Veritaseum, Inc. and Veritaseum LLC.  Ve Assets currently appears to be offering cryptographic tokens that purport to represent interests in precious-metal holdings.  Middleton is Ve Assets' principal.

## BACKGROUND ON DIGITAL TOKENS OR COINS

25.     An ICO is a fundraising event in which an entity offers participants a unique "coin" or "token" issued on a "blockchain" or cryptographically-secured ledger, in exchange for consideration (often in the form of digital assets or fiat currency).[1]

26.     ICOs are typically announced and promoted through public online channels.  To participate, investors are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account.  During or after the completion of the ICO, the issuer will distribute its unique coin or token to the participants' unique address on the blockchain.  In some instances, the coins or tokens may continue to be offered and sold by the issuer after the ICO has been completed.  Often the tokens trade in secondary markets.

---

[1]     A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in unchangeable, digitally-recorded data packages called blocks.  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain.  The system relies on cryptographic techniques for secure recording of transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  The Bitcoin blockchain is an example of a "non-permissioned," or public and open-access blockchain.  "Permissioned" or private blockchains require permissioned servers to be approved to participate on the network or to access particular information on the blockchain.  Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

## FACTS

### A.    Veritaseum, Inc. and Middleton's First Fundraising Efforts

27.    Sometime around the end of 2013 or early 2014, Middleton began to hold himself

out as an innovator in the area of FinTech (an abbreviation for financial technology), claiming in

social media posts and websites that he had developed a technology that would revolutionize the

financial markets.  The crux of Middleton's claim was that his software permitted "peer to peer

exchanges of value" using a blockchain.

28.    In an early and publicly available brochure for this software ("Brochure 1"),

which he initially called "UltraCoin" and later called "Veritaseum Value Trading" (the "Bitcoin

Software"), Middleton stated that "UltraCoin enables individuals & corporations (the Davids) of

all sizes and incomes to level the playing field with Global institutions (the Goliaths) such as

Multi-national banks!"

29.    Brochure 1 claimed that Veritaseum, Inc.'s "Potential Market LITERALLY

Boggles the Mind!" in that "We Get a Potential Market of . . . $225,520,000,000," which could

yield "***well over a BILLION*** dollars in annual cashflow [sic]," such that "**UltraCoin is valued**

**over $20,000,000,000**, " and that Veritaseum, Inc. was "the only one with a functional product,

not to mention the only one ready to bring a product to market," and a "Renown [sic] CEO

proven to have the pulse of both finance and technology market booms and busts."

30.    Another publicly available brochure ("Brochure 2") touted Veritaseum's access to

"$1.635+ Quadrillion – Literally the Market of All Money" and "Cumulative Revenues" as "The

Shape Every Investor Wants to See," and that Veritaseum was "Ready to go to market! NOW!"

31.    A third publicly available brochure ("Brochure 3") stated that "With Veritaseum,

one can literally tweet an entire trade, or click a Friend on Facebook to take the other side of a

short Goldman long Facebook trade." Brochure 3 said that the Bitcoin Software offers the "ability to do practically everything your bank and brokerage offers through your browser."

32.     Middleton drafted the marketing materials for the brochures, which bore his name and picture and the "Veritaseum" logo.

33.     Defendants knew or recklessly disregarded that many of the statements in these brochures were false. Middleton was working on software to emulate swaps, but it was not true that the Bitcoin Software was "ready to go to market now," that it was a substitute for banks or brokerages, or that it permitted access to trillions of capital markets or billions in revenue.

34.     Around this time, Middleton filed certain patent applications concerning the Bitcoin Software on behalf of Veritaseum, Inc., but they were never approved by any jurisdiction in which they were filed. To the contrary, in August of 2015, Middleton received a preliminary opinion from an international patent office stating that the Bitcoin Software "lack[ed] novelty."

35.     By October 2016, Middleton had raised approximately $470,000 for "Class B" shares of stock in Veritaseum, Inc., and thousands worth in Bitcoin from investors in exchange for "Colored Coins," a particular way of encoding encrypted assets on the Bitcoin blockchain— all monies presumably raised to fund his development of the Bitcoin Software.

36.     In early 2017, Middleton announced the end of his Bitcoin Software venture due to "regulatory concerns," although in reality Middleton's venture had failed because he lacked the ability to deliver on the lofty promises he had made and because he had run out of money.

37.     During the Offering, Middleton also offered to redeem the Class B shares and Colored Coins in exchange for VERI, and did redeem most Colored Coins for VERI.

**B.     The Unregistered Fraudulent Offering**

38.     In early 2017, Middleton formed Veritaseum, LLC and appropriated Veritaseum, Inc.'s business concept—*i.e.*, a purported platform that would enable swap-like transactions. But

instead of smart contracts written on the Bitcoin blockchain, Middleton purported to develop the software via smart contracts written on the Ethereum blockchain.

39.     Middleton eventually began calling this product, or other products he purported to seek to develop on the Ethereum blockchain, the "VeADIR" (pronounced like "Vader").

40.     On April 1, 2017, in a post on the Veritaseum website (which was styled as a blog) (the "Blog"), Middleton wrote a post entitled "What is the Value Proposition for Veritas?" The post included a link to a "Veritas deal sheet" (the "Term Sheet"), which was shared on the Veritaseum website in multiple posts and, later, on Twitter.

41.     On April 3, 2017, Middleton announced from a Twitter account named "Veritaseum UltraCoin" that it was "ground zero" for the "Veritas Offering."

42.     In subsequent pre-Offering Tweets, Middleton directed readers to: (i) a Google "crowdsale presentation" (the "Google Presentation"); (ii) a series of YouTube videos explaining "Why buy Veritas?"; and (iii) the Term Sheets (the "Offering Documents").

43.     The Term Sheet explained that 51 million of 100 million minted VERI Tokens were available, and Middleton explained in a YouTube video that the maximum offering was for "$160,000,000" and that purchasers could buy as little or as much VERI as they wanted.

44.     As the Term Sheet explained, the price of VERI during the ICO phase would be pegged to the value of the digital asset known as ETH, such that 1 ETH token entitled a purchaser to 30 VERI subject to discounts during the first approximately 11 days of the Offering. Given the changing value of ETH between April 25, 2017, and May 26, 2017, VERI tokens sold for the equivalent of between $1.60 and $8 during the Offering's ICO phase.

45.     On April 24, 2017, Middleton tweeted that VERI tokens would be on sale the next day, and, on April 25, he sent an email blast announcing that VERI was available for sale.

46.    Middleton also announced the start of the Offering on a website called "Bitcoin Talk" on April 26, 2017, linking to the Offering Documents, and announcing a "bounty program."  Under the bounty program, Middleton promised to pay individuals up to 50,000 VERI tokens (which he stated was the equivalent of $104,000) to website users for making blog posts, Tweets, or Facebook posts touting VERI.

47.    Defendants sold approximately 1.9 million VERI tokens during the ICO phase, raising approximately 69,000 ETH (or $14.8 million, at the time).

48.    Defendants continued selling VERI after the purported end of the ICO phase, selling thousands of VERI through July 6, 2017, and smaller amounts through at least February 2018, during which Defendants raised an additional nearly $2.6 million from investors.

49.    All sales after May 26, 2017, were purportedly offered at a 10% premium to the last five listed prices on the online digital asset platform EtherDelta.

50.    Defendants made other post-ICO transfers of VERI, including as an exchange for services and/or as compensation to employees and to holders of Colored Coins.

*(a)    Defendants Market VERI as an Investment into Defendants' Enterprise*

51.    In an attempt to circumvent the federal securities laws' registration requirements, Defendants frequently claimed, both before and during the Offering, that because of "regulatory concerns" they were not in fact "offering securities."

52.    Notwithstanding these statements, the substance of what Defendants were offering and selling—investments in VERI tokens—was plain.  VERI purchasers would have reasonably expected to profit from Defendants' efforts—or "to make money," as Middleton starkly stated on YouTube.

53.    *First,* Defendants encouraged purchasers to tender money (primarily in the form of digital assets) to obtain their VERI tokens.  They explained that the Blog had "an explicit link

for the crowd sale . . . a link for Ethereum purchases, for ETH, Ethereum, there is a page for purchasing through Bitcoin," and encouraged buyers to "wire" fiat currencies as well.

54.     *Second*, Defendants conveyed that investors' monies would be pooled into a common enterprise.  The Term Sheet, for example, stated that the "Use of digital assets" would be "Research and Development 30%; Sales . . . 30%; Operations 13%; Legal: 10%; Reserves: 10%, DAO liquidity provisions: 7%."  Similarly, Middleton stated in an April 3, 2017 YouTube video, "We have the tools, we have IP that we own, we have the beginning, and with your assistance, this initial coin offering, we will have the funding to make it a reality."  Middleton also told one Veritaseum, Inc. investor, who asked how the ICO related to his Veritaseum, Inc. shares, that the ICO was intended to provide the enterprise "working capital."

55.     *Third*, Defendants led purchasers to expect profits from their VERI purchasers because of Defendants' managerial expertise.  For example, Middleton repeatedly touted his claimed expertise in predicting watershed technological and financial developments, describing in the Term Sheet and other fora the supposed Veritaseum "Team" and their expected efforts to "bring value."  On May 8, 2017, he also posted that investors could profit from their token purchases as follows: "today's roughly $3.30 purchase of VERI tokens could yield ($3.30 x 5,000%=) $165[.]"

56.     Defendants made myriad other such statements before and during the ICO phase of the Offering.  For example, Defendants:

    a.  Noted on the Blog and in a separate article on a website called "ZeroHedge" that "[t]hose who invested in bitcoin at its inception and held on enjoyed 1,450% return"; that "Ethereum and Dash" had "outperformed bitcoin in ROI [Return on Investment]," but that VERI was "the best of both worlds," such that "Veritaseum seeks to maximize economic profit, not just the value of the token for actual or potential investors"; and that Veritaseum would potential deliver 5,000% returns;

b. Explained to viewers in a series of YouTube videos introducing the Offering that their "purchase of Veritas goes directly to fund the transformation of finance" and that "when you purchase Veritas, you create, you fund, the decentralization of this central authority;" that "since Veritas should be or will be a scarce commodity, the more people that come in, the more entities that come in, the more users of Veritas, the greater the demand for Veritas and the more valuable the Veritas is"; and that once potential institutional investors "start looking at these numbers, 30,000% returns . . . negative correlation of assets, there's going to be a flood, when that flood comes in" there will be "higher demand" for VERI;

c. Touted in a May 19, 2017 video "30,000x" returns in the ICO space, and answered an interviewer's question about how to make money with Veritas by saying: "There's a couple of ways . . . you redeem [the token] to Reggie Middleton or Veritaseum . . . or you can take this token and you can buy access to one of the financial machines . . . or you can take the token and you can speculate, which is not what we are selling or recommending, but speculation is speculation, so if you think it's going to go up, just like a Walmart card, you think a Walmart gift card might be worth more, you can do it . . . Walmart is not selling you a security, you are choosing to speculate on it[;]"

d. Stated in a series of posts on Bitcoin Forum that Middleton was "going to try very hard to bring the hedge fund community in with [him] as buy side investors," and that "[n]ot too long after the end of our offering, [Middleton] will go on a very aggressive valuation tour, valuing and evaluating most prominent concerns and the platforms they are written on top of, in this space";

e. Answered a user question in a YouTube video about how many VERI tokens were needed "to invest in Veritaseum," by stating: "I don't know if the word invest is appropriate . . . we are not selling investments, I've said that often and I'm going to say that over and over and over, because we could get in a lot of trouble if it appears that we are selling investments, and I am not, we are selling technology, the technology will allow you to make peer to peer investments . . . the [VERI] Tokens will be . . . the medium for participating in the DAO [Decentralized Autonomous Organization], you send the tokens to the DAO, ok, the DAO would then give you a pro-rata exposure, depending on how many you share, and it will do its thing, after our pre-determined period . . . it will then divvy up and give pro-rata profits and losses to all . . . VERITAS token holders";

f. Linked readers of Bitcoin Forum to an article on another website that stated: "Aimed for usual customers, Veritas are still not protected from speculation, especially in the long run perspective. It will continue to be a tradeable token. Nevertheless, buying Veritas tokens now during the ICO could be a great

13

investment 'in the future' while enjoying the services they provide.  In any case, it is a win-win deal";

g.  Stated on the Blog that Middleton had "given a lot of thought to the topic of valuation with regards to investment"; that he had "an excellent public track record over the last 10 years, and even more of a record in private performance"; that he had "decided to focus [his] expertise and experience on the burgeoning digital token ecosystem by creating a Digital Asset Valuation Framework and issuing tokens to support it"; that investment returns in the digital asset space are comparable to those in the regular stock market and that the former "outperform equity markets by a wide margin"; and that "our token offering is actually ongoing now";

h.  Stated that "at the end of the day, if you produce a superior product and it's recognized by your constituency, [it] is manifested in a higher token price";

i.  Told readers of the Blog on April 2 that they could expect to trade the VERI Tokens on "major exchanges"; and

j.  Explained in a May 24 YouTube video that "it is not about how much that will come from a token sale, it should be about how much value is generated—what we produce in terms of revenues, in terms of margins, in terms of profits, in terms of market share, and in terms of furthering the economic interest of our stakeholders, which are those who use Veritaseum."

57.  Defendants continued to convey that the economic substance of purchasing a

VERI token was the making of an investment in a common enterprise with a reasonable

expectation of profits based on their efforts after the purported "close" of the ICO on May 26,

2017.  For example:

a.  Middleton persistently touted the price increases and returns to early VERI purchasers in various tweets in June 2017 during the period in which he was selling VERI to investors in private over-the-counter transactions;

b.  Defendants boasted about VERI's price increases when announcing supposed "deals" between Veritaseum and would-be clients, including on July 4, 2017, when Middleton tweeted that VERI had risen 65% since the announcement of a supposed deal with a stock exchange;

c.  Middleton responded on June 7 to a Bitcoin Forum user's argument that purchasing VERI was risky because Defendants held 98% of the supply by noting that the supply was being used for deals that had "caused VERI['s]

14

price to more than double," that he had "many more deals in the pipeline," and that he "would expect a pop with each deal";

d.    Middleton wrote in later July that the "execution of management and the team play a prominent role" in the value of VERI, which was "evident in our marketing materials" such that "the value of the team is what you are purchasing VERI"; and

e.    Defendants told investors that they were working to get VERI listed on digital asset trading platforms, including in an email from Middleton responding to an investor query concerning how the investor might "cash out."

58.    Cognizant of the federal securities laws' application to VERI, Defendants so-called "utility" token, claiming that the VERI tokens' supposed uses were variously as (1) a "pre-paid fee" that could be exchanged for "consulting and advisory services" and used to buy "unlimited access to research," (2) a "universal key to gain access to Veritaseum P2P OTC Direct Contracts," and (3) a means to access "Veritaseum Legacy Asset Exposure Pools."

59.    Despite these claims, none of the purported software functionalities existed at the time of the Offering.  Defendants did not have any functioning Ethereum-based application or any "legacy asset exposure pools," nor did they specify what the purported consulting services were.  Though they made research reports (outsourced to financial analysts in India) available, the reports were not available during the Offering's ICO phase.

60.    By December 2017, purchasers had ultimately tendered only 23.5 of the approximately 2 million VERI tokens sold in the Offering in exchange for research reports, with no more than 75 tokens exchanged for research (or any other "services") through June 2018.

61.    The volume of VERI trades on EtherDelta, by contrast, hit the tens of millions in the summer of 2017, fueled in large part by Defendants' touting VERI's increased price.

62.    Indeed, investors routinely let Middleton know that they were purchasing VERI to speculate on its price.  One user asked for "clear instructions [on] how can we invest in your

project," and another told Middleton leading up to the Offering that he wanted to hold "the veritas token as an investment for the long term" and asked if the token would be listed on exchanges. Middleton replied yes.

      (b)    *Defendants' Material Misrepresentations and Omissions to VERI Purchasers*

63.    Middleton deceived the public about VERI from the outset of the Offering.

64.    He began by misleadingly stating in a video and in the Google Presentation that he had abandoned the Bitcoin Software project because of "regulatory concerns."

65.    In fact, Middleton ceased the Bitcoin Software project because he had run out of money, had received nothing but negative responses to his supposed patent applications, had not communicated with any regulatory body—government or otherwise—about potential "concerns" with the Bitcoin software, and was, generally speaking, not able to deliver on his lofty promises that the software would be worth $20 billion.

66.    More importantly, the central device underlying Defendants' deceptive scheme and material misstatements was to persistently blur the line between the rudimentary "product" Veritaseum had developed (the Bitcoin Software, which replicated swaps based on changes in value of underlying assets), and the "revolutionary" products they *hoped* to develop.

67.    In statements before and during the Offering, Middleton persistently misled individuals into thinking that Defendants had *existing* products that would "revolutionize" the markets when, in reality, Defendants merely had an idea and stalled patent applications.

68.    The Google Presentation, for example, contained a link to Brochure 3, claiming that users of the supposed software could effect trades by making clicks from their phones. The Google Presentation also falsely stated that the new "platform is functional now as beta."

69.    The Google Presentation, like Brochure 2, described Veritaseum's platform as a "Decentralized Autonomous Organization," or "DAO," and stated that Veritaseum could

"disintermediate $1.635+ Quadrillion" in financial transactions and could "match nearly any bank, exchange or brokerage's investor."

70.     Similarly, in pre-Offering YouTube posts and posts on the Blog, Middleton touted the "usable" and "stable" software platform, including a post on April 1 that Defendants had a "working, beta product already developed."

71.     In another YouTube video, Middleton stated the following: "With Veritas you create a contract, you send it out to the blockchain, someone else accepts the contract, you have a deal.  These contracts could be for exposure, and investing, transfer of value, simple agreements, letters of credit, transfer of information, anything that can be considered value."

72.     The Term Sheet similarly and misleadingly stated that the software being sold "enable[s] individuals and entities to transact directly with each other . . . without brokerages, banks or traditional exchanges."

73.     On April 26, 2017, Middleton stated that Veritaseum was one of the first entities "to apply smart contracts and blockchain tech to the capital markets" and that the company "has several patents pending as well as an existing, functional codebase."

74.     Middleton also wrote to media and bloggers that Veritaseum "had a functional beta product [and] multiple patent apps (with priority dates before the big boys)."

75.     On May 8, 2017, in a posting on the FinTech website "Zero Hedge," Middleton falsely referred to "*existing* and future blockchain-based software products" (emphasis added) that could be used with VERI.

76.     As Defendants knew or recklessly disregarded, these statements were, at best, materially misleading.  Users could not effect trades with their phones and there was no functional, Ethereum blockchain-based beta application.  There were no "existing" products that

VERI holders could use with their ERC-20 tokens (the Bitcoin Software, no longer operational, worked only on the Bitcoin blockchain). And no user could enter into any contract with a third party by purchasing VERI.

77. Nor did Middleton have any basis to state that his (non-existent) products would tap into "quadrillions" of funds or replace major financial institutions any time in the foreseeable future, if ever. His statements were aimed at taking advantage of potential investors' general lack of familiarity, but keen interest in, the nascent FinTech industry, and nothing more.

78. Nor did Defendants limit their fraudulently misleading misstatements and omissions to Veritaseum's products. During and after the ICO phase, they also lied to potential investors about the use to which Defendants would put the VERI that did not sell during the ICO.

79. During and after the ICO phase, several investors expressed concerns (in direct emails to Middleton, on Bitcoin Forum, and elsewhere) about potential dilution and a drop in VERI tokens' price given that Middleton held the overwhelming majority of VERI Tokens.

80. To assuage these concerns, Middleton repeatedly stated that he would only use VERI tokens not sold during the ICO phase for bulk sales to institutions and high-net-worth individuals interested in employing VERI in connection with its supposed products.

81. For example, on May 3, 2017, Middleton wrote in Bitcoin Forum that "[u]nsold tokens go to our reserve to sate future demand. Our project is ultimately aimed at the buy side of Wall Street . . . We expect to sell tokens in large blocks to buyside institutions such as hedge funds, pension funds, family offices and high net worth individuals as well as advisory firms."

82. On July 2, 2017, Middleton wrote to a digital asset trading platform on which he was attempting to have VERI traded that "tokens that were not purchased in the initial sale are

reserved [*sic*] for sale to institutions, family offices and UHNW [ultra-high-net-worth] individuals, usually for the purpose of building custom solutions."

83.     On June 7, 2017, Middleton told an investor in writing that the remaining VERI were "reserved for bulk institutional purchase and incentive comp only."

84.     In fact, from the day after the ICO "closed" on May 28, 2017, though February 2018, Defendants sold at least approximately 27,500 VERI to any purchaser who wanted to buy it, without regard to whether the investor was an "institution" or "high-net-worth individual," and regardless of how they intended to use the VERI.

85.     Defendants also used VERI tokens to pay developers and other employees, and to resolve the claims that Colored Coin purchasers may have had against Veritaseum.

86.     After the ICO phase, and as they were continuing to sell VERI, Defendants began misleading the market about the supposed business deals and sales of VERI that they had made.

87.     For example, on June 19, 2017, Middleton tweeted: "$34,873,719 worth of $VERI has been sold to institutions, HNW, etc. since 6/1, and VERI price > ~6x[.]"  Then, between July 3 and July 5, Middleton stated that he had entered into two big global deal, and that an "UHNW" had purchased $1 million worth of VERI.

88.     In reality, the claims about the $34 million and $1 million invested had no factual basis.  No such sales were made, and Veritaseum did not enter into two big global deals.

89.     The import of these statements was that Middleton was creating value for holders of VERI.  Middleton posted on Twitter on June 16, 2017:  "Expect more demand for $VERI as institutions/startups come on board."

90.     That same day, the Defendants also tweeted, "Who's investigating bulk $VERI purchase:  expanding airline, medical marijuana startup, electric motorcycle startup."  In reality,

none of these entities ever purchased VERI.  A few had approached Defendants to seek funding, but not to purchase tokens.

91.     Middleton also announced on Twitter that a "[c]ustomer made large $VERI purchase, retaining us to 'VERItize' medical biz, explore business processes thru blockchain[.]" In fact, Defendants were never hired to "VERItize" a medical business.

92.     On June 30, 2017, Middleton falsely stated that he had "made three deals in the last 24 hours, one was with one of the largest stock exchanges in the Caribbean . . . one was a UHNW individual (starting with $1-$1.5M purchase), and one with a sovereign nation."  In fact, the latter two "deals" do not appear to exist.

93.     On July 7, 2017, Middleton falsely stated in an Internet forum that the "biggest visible distribution from 'reggie's wallet' of [VERI] tokens thus far would be the proposed [Caribbean stock exchange] deal," even though the exchange had not bought a single VERI.

94.     Finally, following the Offering's ICO phase, Middleton promoted the rise in VERI's trading price on the EtherDelta platform.  On June 5, 2017, Middleton tweeted that VERI "currently trading on [EtherDelta] as 3rd highest in volume, price up 5x[.]"  On June 7, 2017, Defendants tweeted that VERI had risen "1893% since last week[.]"  Defendants omitted the material information that, as set forth below, Middleton himself manipulated the price of VERI on EtherDelta on June 4, 2017, causing it to rise over 300%, and to give the appearance that there was increased interest in VERI.

95.     Defendants' misstatements to the market had a marked effect on the price of VERI, which rose exponentially from their ICO sales prices of $1.60 to $8 to over $300 by the end of July 2017, including dramatic rises of about 100% on or around the days of Middleton's material misstatements about supposedly large sales of VERI or explosive business deals.

96.    The importance of Defendants' misstatements to investors is further evidenced by investors' responses on the Internet to them, including, as an example, an investor noting on June 10, 2017, that someone "wanted out of [VERI] they could easily sell for 5x profit right now," and another parroting Brochure 2's claim that VERI had access to "$1.635 Quadrillion."

97.    Defendants knew or recklessly disregarded that their statements about the sales of VERI Tokens and the non-existent deals were false because Middleton was the sole individual who marketed VERI and had control of the VERI Tokens on the Ethereum blockchain.

**C.    Middleton's Manipulation of VERI**

98.    Middleton controlled an Ethereum blockchain address identified by a 42-character alphanumeric string that began with "0xfB90."[2]

99.    On May 31, 2017, Middleton posted on Bitcoin Forum that he was "Testing EtherDelta as a method of distributing post-Offering Veritas tokens."

100.    The first six ever trades of VERI on EtherDelta—six sales of VERI at the set price of 0.1 ETH per VERI Token—were all conducted by the fB90 address that very day.

101.    On June 1, 2017, Middleton emailed Employee One a spreadsheet, commenting that "the EtherDelta market is not accurate because of the very, very low volume.  I will try to push more volume in."  Middleton went on to say that, notwithstanding the low volume, the total value of his approximately 98 million VERI Tokens and their current price on EtherDelta "brings a smile" to his face and that "[t]his time next month, [he]'ll probably have all (as in every single) hip hop and rap star/producer beat in net worth."

102.    On June 2, a user posted on Bitcoin Forum that the "EtherDelta exchange price for VERI/ETH [was] going the wrong way at the moment."

---

[2]    This address is referred to as "fB90," and references to other Ethereum blockchain addresses follow that same naming convention.

103.    Middleton responded on June 3:  "We set up the EtherDelta VERI ticker as an experiment.  Please be aware that EtherDelta has very little traffic and liquidity."

104.    On June 4, 2017, the fB90 address conducted 52 purchases of VERI on EtherDelta.  To effect these transactions, fB90 spent nearly 337 ETH (over $80,000 worth at the time) to purchase 4,769 VERI in various-sized transactions at an average premium of 51% to the last non-fB90-traded price.  By the end of the day, the price of VERI on EtherDelta had increased 315% as a result of the trading by fB90, which constituted approximately 82.6% of the volume of VERI's trading on EtherDelta that day.

105.    On June 7, 2017, Middleton noted to Employee One in an email that each VERI was now worth $79.55.  He wrote:  "This means the argument can be made that we're multi-billionaires if we can push enough liquidity through EtherDelta and deliver on our value proposition," and listed his net worth at $2.36 billion in light of his $2.34 billion worth of VERI.

106.    Middleton then touted the VERI tokens' price increase in a series of tweets:

    a.  On June 5, he tweeted "price up 5x" and "3rd highest in volume" with respect to VERI trading on EtherDelta, and directed readers to EtherDelta to purchase VERI;

    b.  On June 7, he tweeted that VERI was the "most successful offering in the history of the nascent crypto industry, up 1893% since last week"; and

    c.  On June 9, he tweeted: "Veritas software sold for $1.71 per token on 1st day of sale.  Most recent transaction was $65.40, 4,783% in 40 days.  Value recognition?"

107.    Middleton's manipulative trading on June 4, 2017 directly benefitted his bottom line because he owned approximately 98 million VERI tokens—tokens he could and did ultimately did sell thereafter, both on EtherDelta and in private sales to investors at prices pegged to EtherDelta's trading price.

**D.**   **Defendants' Misuse of Investor Funds**

(a)   *Defendants Misappropriate and Commingle Offering Proceeds for Personal Use*

108.   Defendants never disclosed to investors during the Offering, in the Term Sheet or otherwise, that Middleton would pay himself a "salary."  Nevertheless, during the Offering, Middleton began converting proceeds into dollars and spending them, at least in part, on personal expenses, or commingling them with personal assets.

109.   Between May 12, 2017, and July 19, 2017, the Defendants converted ETH received in the Offering into approximately $285,000.  Middleton transferred at least $75,000 of those amounts to his personal account.  Middleton converted thousands of ETH into millions of dollars after July, 2017, and used at least a portion of unknown, undisclosed amounts for personal expenses or commingled such proceeds with his own assets.

110.   Similarly, in late June 2017 Defendants received $1 million from Investor One, a connected political figure, to further fund his business.

111.   Middleton spent most of the $1 million from Investor One in personal expenses, including to make a $100,000 campaign contribution, with only approximately another $100,000 going to Veritaseum's business, and nearly $450,000 directly to Middleton's personal accounts.

112.   Later in 2017, Defendants paid Investor One back half of Investor One's loan using Offering proceeds, and hired Investor One as a Veritaseum employee.

(b)   *Defendants Fund a Commodities Venture with Offering Proceeds*

113.   On or about August 7, 2018, Defendants began using Ve Assets to offer and sell "VeGold" precious metal-backed tokens.  Although VeGold's marketing materials focused on tokens backed by gold, Defendants also offered tokens backed by palladium and silver.  Middleton advertised the "soft beta launch" of the program on Twitter and linked to a presentation on Veritaseum's website (the "VeGold Presentation").

23

114.    The VeGold Presentation advertised VeGold as allowing a transferable, negotiable title to ownership in the underlying precious metal and allowing the holder of the token to redeem the token for the physical precious metal or to sell the token back to Veritaseum.

115.    Holders of VERI tokens can tender VERI to Defendants for a slight discount on the purchase of the VeGold.

116.    Defendants misappropriated at least $600,000 worth of ETH raised in the Offering to purchase the physical precious metals underlying the VeGold tokens.  In addition, ETH raised from the sale of the VeGold tokens was automatically routed by the smart contract enabling the sale of the tokens to an account in Middleton's name at a digital asset trading platform.  In other words, Defendants used VERI investor funds to purchase the inventory to be sold by Ve Assets, but the proceeds of such sales flowed to Middleton rather than to Veritaseum.

117.    The VeGold smart contract also triggered an Ethereum blockchain address holding reserves of VeGold to issue VeGold to purchasers.

118.    Similarly, when VeGold holders redeemed their VeGold, they were paid in ETH from an address holding the proceeds of the Offering.

*(c)    Defendants Further Transfer VERI Investor Assets*

119.    On approximately July 30, 2019, the Commission staff notified Defendants' counsel that it was likely to recommend that the Commission approve an enforcement action.

120.    Shortly thereafter, on or about July 30, 2019, Middleton transferred 10,000 ETH from the Offering to an Ethereum blockchain address, "2483."  That address then sent a total of 750 ETH to the VeGold smart contract, which then sent it to Middleton's personal account at the digital asset platform and also transferred an equivalent amount of VeGold tokens back to 2483.

121.     Those VeGold tokens were sent to blockchain addresses controlled by unknown parties.

122.     On August 5, 2019, Commission staff requested through Defendants' counsel that Defendants voluntarily agree to not engage in further dissipation of the Offering proceeds, including through the purchase of precious metals.  Defendants, through counsel, declined.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (All Defendants)

123.     The Commission repeats, realleges and incorporates by reference paragraphs 1 through 122, as though fully set forth herein.

124.     By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit; and Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

125.     By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

### SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

126.     The Commission repeats, realleges and incorporates by reference paragraphs 1 through 122, as though fully set forth herein.

127.    By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:  (a) Defendants employed devices, schemes or artifices to defraud; (b) Defendants obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) Defendants engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

128.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(All Defendants)**

129.    The Commission repeats, realleges and incorporates by reference paragraphs 1 through 122, as though fully set forth herein.

130.    By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

131.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and e(c)].

### FOURTH CLAIM FOR RELIEF
### Violations of Section 9(a)(2) of the Exchange Act
### (Defendant Middleton)

132.    The Commission repeats, realleges, and incorporates by reference paragraphs 1 through 122, as though fully set forth herein.

133.    On or about June 4, 2017, Middleton, directly or indirectly, singly or in concert, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security, which was not a government security or a security-based swap agreement with respect to a government security, creating actual or apparent trading in such security and raising the price of such security, for the purpose of inducing the purchase or sale of such security by others.

134.    By virtue of the foregoing, Defendant Middleton, directly or indirectly, singly or in concert, violated, and unless enjoined and restrained will continue to violate Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78$i$(a)(2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminarily freezing all of Defendants' assets;

## II.

An Order temporarily and preliminarily enjoining and restraining Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents;

## III.

An Order providing that the Commission may take expedited discovery;

## IV.

An Order appointing a qualified third-party as an independent intermediary that can escrow all digital assets in the possession or control of Defendants.

## V.

A Final Judgment permanently restraining and enjoining (A) Defendants, their agents, servants, employees and attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from (i) violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; (ii) violating Section 10(b) of the Exchange Act, [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (B) Defendant Middleton, his agents, servants, employees and attorneys and other persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from violating Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78$i$(a)(2)];

## VI.

A Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

## VII.

A Final Judgment permanently barring Defendant Middleton from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## VIII.

A Final Judgment prohibiting Defendants from participating in any offering of digital asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

## IX.

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## X.

Such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

Dated: New York, New York
        August 12, 2019

SECURITIES AND EXCHANGE COMMISSION

By: _____

Marc P. Berger
Lara S. Mehraban
John O. Enright
Jorge G. Tenreiro
Victor Suthammanont
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov
Attorneys for Plaintiff