UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :
                           Plaintiff,  :         19 Civ. 4625 (WKF) (RER)
                                       :
              - against -              :         ECF Case
                                       :
REGINALD ("REGGIE") MIDDLETON,         :
VERITASEUM, INC., and                  :
VERITASEUM, LLC,                       :
                                       :
                           Defendants, :
                                       :
------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS APPLICATION FOR A
PRELIMINARY INJUNCTION FREEZING ASSETS AND OTHER RELIEF**

Jorge G. Tenreiro
Victor Suthammanont
Karen E. Willenken

Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

August 22, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.   The Commission Need Show Only a Basis to Infer Securities Law Violations To Obtain a Freeze of Defendants' Assets ................................................................................... 2

    II.  Compelling Evidence Exists that VERI Are Securities ...................................................... 3

        A.   Defendants Induced Investors to Invest in VERI for Profit and Then Tried to "Sanit[ize]" the Economic Reality with Disclaimers ................................................. 4

        B.   VERI Purchasers Reasonably Expected Profits from Their Purchases ....................... 6

        C.   VERI are Investment Contracts Under *Howey* and Were Not Purchased for Use or Consumption ......................................................................................................... 8

    III. Defendants Have Not Rebutted the Evidence of Their Fraud, Manipulation, and Unregistered Offerings ............................................................................................... 12

    IV. The Court Should Impose an Asset Freeze To Preserve Investor Funds .......................... 14

CONCLUSION ........................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cameron v. Outdoor Resorts of Am.*, 608 F.2d 187 (5th Cir. 1979) ......................................... 9, 10

*Continental Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) .................................................. 11

*Gary Plastic Packaging Corp. v. Merrill Lynch*, 756 F.2d 230 (2d Cir. 1985) ........................... 12

*Glen-Arden Commodities, Inc. v. SEC*, 493 F.2d 1027 (2d Cir. 1974) ........................................ 11

*Grenader v. Spitz*, 537 F.2d 612 (2d Cir. 1976) ...................................................................... 9, 10

*SEC v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866 (S.D.N.Y. 1981) ......................................... 11

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982) ................................................... 11

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ............................................................ 10

*SEC v. Callahan*, No. 12 Civ. 1065, 2015 WL 10853927 (E.D.N.Y. Dec. 24, 2015) .................... 3

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998), *aff'd* 155 F.3d 129 (2d Cir. 1998) ............ 13

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ............................................................................. 3

*SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2010 WL 768944
   (S.D.N.Y. Mar. 8, 2010) ............................................................................................................ 15

*SEC v. Cuban*, 798 F. Supp. 2d 783 (N.D. Tex. 2011) ................................................................ 14

*SEC v. Edwards*, 540 U.S. 389 (2004) ......................................................................................... 10

*SEC v. Feng*, No. 15 Civ. 9420, 2017 WL 6551107 (C.D. Cal. Aug. 10, 2017) .......................... 10

*SEC v. Forte*, 598 F. Supp. 2d 689 (E.D. Pa. 2009) ...................................................................... 3

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) ........................................... 15

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .................................................. 3

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) .......................................................... 3

*SEC v. Miller*, 808 F.3d 623 (2d Cir. 2015) ................................................................................... 3

*SEC v. PlexCorps*, No. 17 Civ. 7007, 2018 WL 3038500 (E.D.N.Y. June 19, 2018) .................... 2

*SEC v. Schiffer*, No. 97 Civ. 5853, 1998 WL 307375 (S.D.N.Y. June 10, 1998) ........................ 13

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ............................................................................. 9, 10

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031, 2011 WL 887940
   (E.D.N.Y. Mar. 14, 2011) ........................................................................................................... 3

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ............................................................ 2, 3, 14

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ....................................................................... passim

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) .................................................................................. 2

*Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543
   (D.N.J. Dec. 10, 2018) ............................................................................................................ 10

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .................................................................................. 9

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) ........................................... 4, 8, 10

*United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339
   (E.D.N.Y. Sept. 11, 2018) ...................................................................................................... 12

**Statutes**

15 U.S.C. § 78*i*(b)(2) .............................................................................................................. 2, 13

**Other Authorities**

"Framework for 'Investment Contract' Analysis of Digital Assets,"
   https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ............. 12

*The Ticket Reserve, Inc.*, 2003 WL 22195093 (SEC No-Action Letter) (Sept. 11, 2003) ........... 12

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law, together with accompanying papers, in further support of its Application.[1]

## PRELIMINARY STATEMENT

Defendants made unregistered offers and sales of securities—VERI—because, as they concede, they sold VERI to "finance [a] new enterprise" with a "global team" while "referr[ing] to the potential for the tokens to increase in value as [they] developed" this plan.  Def. Br. at 7, 9.  Indeed, when pitching VERI, Defendants encouraged buyers to view it as an instrument for speculation by, for example, speaking of potential "yields" of 5,000% and promising to make (and then making) VERI available for trading on digital asset platforms.  Defendants also then traded VERI to, essentially, create a market.  Moreover, their sales of VERI in the Offering—to any purchaser (regardless of ability or desire to "use" any service), in any amount (unrelated to any such "use"), and at any price (unconnected to the value of any existing such "use")—demonstrate no correlation between sales and intended "uses."  VERI are squarely investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and, therefore, securities.

Yet to avoid SEC jurisdiction, Defendants simultaneously sought to—as Middleton described it—"sanit[ize]" the word "investment" from documents, as if whitewashing the label of an investment could erase its economic reality.  Defendants also now ask the Court to ignore the economic reality of their market-creation efforts for VERI, and of unbridled sales, insisting VERI are "utility tokens."  But they also concede there was no use for VERI (on reports or otherwise) until "shortly after" the ICO and that only a smattering of purchasers ever used VERI for these reports during the Offering.  Middleton Decl. ¶ 24.  In any event, the amounts invested

---

[1] Capitalized terms not defined have the meaning ascribed in the Commission's opening brief ("SEC Br.") (D.E. 7).  Defendants' memorandum (D.E. 19) is "Def. Br."  "Ex." refers to sequentially numbered exhibits to the Declarations of Victor Suthammanont (D.E. 3) and "Def. Ex." to exhibits to the Declaration of Reginald Middleton, dated August 19, 2019 (D.E. 33) ("Middleton Decl.").

in VERI, which fluctuated wildly in price during the Offering, did not correlate to the value of the "product," which also shows that purchases were made for investment, not consumption.

Defendants have even less to offer to rebut the Commission's fraud claims. Faced with lies about "large $VERI purchase[s]" and "distribution[s]," Defendants only offer evidence that they were *negotiating* such deals. Defendants also concede that Middleton placed trades on a trading platform, but claim he did so to stimulate a market for VERI so he could use the market to price his own "product." However, because such purpose necessarily implies that Middleton sought to induce additional trades, this proves a violation of Section 9(a)(2) of the Exchange Act.

Finally, Defendants' stated intent to divert VERI Offering proceeds into their latest venture, the "VeGold" business that has nothing to do with what VERI investors invested in, their continued transfers of assets abroad, and the nature of blockchain, additionally warrant an order freezing assets to preserve the *status quo* and protect the Court's ability to award relief.

## ARGUMENT

**I.    The Commission Need Show Only a Basis to Infer Securities Law Violations To Obtain a Freeze of Defendants' Assets**

Almost thirty years ago, in *SEC v. Unifund SAL*, the Second Circuit set forth the standards for Commission preliminary injunctions. 910 F.2d 1028, 1036–41 (2d Cir. 1990). The Court concluded that a preliminary injunction prohibiting future securities law violations—relief not sought here that "accomplish[es] significantly more than preservation of the *status quo*"— requires a showing of a "likelihood of success" on the merits. *Id*. at 1039–40. In contrast, the court concluded that a preliminary asset freeze—which simply "functions like an attachment"— requires only "a basis to infer" that defendants violated the securities laws. *Id*. at 1041. Courts have since reiterated these standards. *See, e.g.*, *Smith v. SEC*, 653 F.3d 121, 127-28 (2d Cir. 2011); *SEC v. PlexCorps*, No. 17 Civ. 7007, 2018 WL 3038500, at *2 (E.D.N.Y. June 19, 2018).

Defendants incorrectly contend that the Commission *must* meet the higher standard of a "[l]ikelihood of [s]uccess on the [m]erits" to secure an asset freeze, citing *SEC v. Miller*, 808 F.3d 623, 635 (2d Cir. 2015). Def. Br. at 17. In *Miller*, however, the Second Circuit did not need to determine whether an inference sufficed, and, far from purporting to overrule *Unifund*, cited a prior case that in turn cited *Unifund* in addressing the standard. *See Miller*, 808 F.3d at 635 n.66 (citing *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (citing *Unifund*, 910 F.2d at 1041)). The *Unifund* standard is still the correct one, and the Commission more than meets it.

Defendants also erroneously argue that the SEC must show that the "balance [of] the equities" favors the SEC. Def. Br. at 16. The Second Circuit has held this showing unnecessary because the SEC is "charged with safeguarding the public interest." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). To be sure, courts look to equitable factors, primarily whether a freeze "might thwart the goal of *compensating investors*." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (emphasis added). Equity does not favor, however, allowing continued use of funds obtained by fraud. Defendants' focus on the effect of a freeze on their workforce and new customers, Def. Br. at 16, ignores the harm to investors of diverting more funds to an entirely new business or Defendants' pockets. *See infra* IV.[2]

## II. Compelling Evidence Exists that VERI Are Investment Contracts

As noted, Defendants do not seriously dispute that VERI purchasers made (1) an investment of money; (2) into a common enterprise; (3) to derive benefit solely from the efforts

---

[2] The remaining proceeds are less than the amount raised in 2017. Nor can Defendants show that *any* asset was "derived from sources other than investor funds," *SEC v. Forte*, 598 F. Supp. 2d 689, 693 (E.D. Pa. 2009). *See* Supp. Daniello Decl. ¶ 4 (Defendants' entire account balances in month before ICO was $623.73). Thus, permitting Veritaseum's current business activities or use of personal assets to continue will dissipate investor assets. *See SEC v. Callahan*, No. 12 Civ. 1065, 2015 WL 10853927, at *2 (E.D.N.Y. Dec. 24, 2015) (the "purpose of an asset freeze is to preserve all of the defendant's assets for the victims of his fraud, and therefore, a 'defendant can be ordered to disgorge funds that were not causally tied to the fraudulent activity.'") (citing *SEC v. Spongetech Delivery Sys., Inc.*, No. 10 Civ. 2031, 2011 WL 887940, at *9 (E.D.N.Y. Mar. 14, 2011)).

3

of others. *Howey*, 328 U.S. at 298-99. Thus, the relevant question is whether the offer and sale of VERI met *Howey*'s "reasonable expectation of profits" prong. Defendants argue they do not because Defendants told purchasers that VERI should "not be regarded as speculative investments" and because VERI had "real and immediate" use under *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975). Def. Br. at 17-19. Defendants' arguments, based on a selective reading of the record—which ignores Defendants' "sanit[izing]" attempts to obscure the economic reality—and on a cramped reading of *Forman*, should be rejected.

### A. Defendants Induced Investors to Purchase VERI for Profit and Then Tried to "Sanit[ize]" the Economic Reality with Disclaimers

The Commission listed more than ten examples where Defendants, despite claiming that VERI was not an "investment," said on various platforms, for example, that "purchase[s] . . . could yield . . . 5,000%," Exs. 11; 12; 19, or that VERI would increase in "value." SEC Br. at 8-10. Defendants attempt to recast these as just a "few" cases and to baldly assert that the SEC "has mischaracterized many" of them. Def. Br. at 9. Defendants also implausibly argue that talking about a 5,000% yield does not refer to "investment returns." Middleton Decl. ¶ 34.

Defendants then fall back on boilerplate warnings in their marketing materials that VERI was not an "investment," even though inducements encouraging readers to think of VERI as an investment typically followed such "warnings." In the "Terms and Conditions," for example, Defendants said that "Veritas are redeemable solely . . . [for] products and services" and then immediately touted that they "plan to make Veritas available to trade on exchanges." Def. Ex. 7 at 10. In the "Usage" of VERI part of a Google Presentation, Defendants, similarly, list only one: "Use, sell or transfer tokens on any . . . exchange." Def. Ex. 6 at 44.

Middleton followed this same pattern on social media. He disclaimed that it was "not legal to sell investments that aren't registered with . . . the SEC," and then promptly touted the

4

potential for "the value and/or demand for the [VERI to] go up" as the "demand" for his products increased. Ex. 40; *see also* Ex. 39 at 2 (Middleton touting "product and clients" while stating that "VERI is currently trading at $80 up 36x . . . as the entire crypto market went down last week").[3] To the extent Defendants mentioned products, they typically provided no clear list of such products and pointed to uses that in reality were false. *Compare* Ex. 39 at 4 (Middleton stating that Defendants "started shipping [several products] before the end of the token offering") *with* Middleton Decl. ¶ 24 (Defendants sold their first "research report . . . shortly after the initial token sale"). Middleton's response to an investor asking for "instructions [on] how . . . [to] invest . . . ," is telling: "we are selling tokens that will . . . expose the 'foreign' . . . token holders to the potential for capital gains. US entities cannot be marketed to in such a fashion, thus the value proposition for those stateside is strictly utility value." Def. Ex. 12. The economic reality is that there is and was only one VERI. Whatever "value proposition" it had for some purchasers ("potential for capital gains") it had for *all* purchases.

Moreover, Middleton's statements over email about the "non-investment" nature of VERI contrast sharply with his statements to investors in private texts. While Middleton points to an email sent to a purported VERI purchaser with the "not investment" disclaimer, Def. Ex. 9 at 12, in private Middleton touted to the purchaser the gradual increase in the price of VERI and the supposed, concomitant increase in the wealth of the purchaser. *See* Ex. 62 (Excerpts for Testimony of Lorna Johnson) ("Johnson Tr.") at 172:24–175:19, 178:15–179:2; Ex. 61 at 4-5.

---

[3] Defendants attempt to analogize VERI to "gift cards," Ex. 63 (Excerpts of Testimony of Reggie Middleton) ("Middleton Tr.") at 147:8-15, 180:2-13, "software," *id.* at 165:13-22, 1562:20-25, and loyalty points. Def. Ex. 7 at 3. But none of those businesses induce purchases by promising that the product would trade on asset platforms (many restrict any transfers). Nor do Defendants explain why a business would find it "imperative to test the exchange" for "small purchases," instead of just selling the product, or why a business would permit third-party open market trades to set the price for its products. Def. Br. at 27-28. This absurdity is illustrated by the fact that one of the "reports" was priced at 100 VERI, *see* Ex. 60, but then sold for one VERI. *See* Def. Ex. 32 at 4.

5

To other investors, Middleton said that Defendants would "mak[e] [their] own market" for VERI, Ex. 55, and that he liked VERI "around the Etherdelta price." Ex. 56.

Finally, what Defendants conveniently *said* VERI purported to be conflicts with what Defendants *did* with their own VERI during the VERI Offering. For example, Defendants:

- sold VERI and bought it on an unregistered exchange, Def. Br. at 27-28;

- offered to redeem the shareholders of Veritaseum, Inc., and Veritaseum's original token investors, with VERI Tokens, Middleton Tr. at 1134:24–1139:12;

- used VERI as "incentive compensation," Middleton Tr. at 1418:13-22; Supp. Suthammanont Decl. ¶ 45 ("bonus" to Patryk Dworznik); and

- sold VERI to individuals they knew viewed VERI as an investment, made no efforts to verify that any purchaser was indeed purchasing for use, placed no restrictions on the transfer of VERI to third parties (as opposed to only to Defendants for purported future services) and sold VERI in all denominations. *See* Second Doody Decl. ¶ 6.

The weight of this evidence shows that Defendants, as Middleton said in an email, were simply trying to "do the 'investment' word sanitation" to prepare for when they could coyly proclaim to the Court that they never meant to sell an "investment." Def. Ex. 9 at 4. The Court should reject Defendants' ploy to mask VERI's economic reality with disingenuous disclaimers.

**B.   VERI Purchasers Reasonably Expected Profits from Their Purchases**

Given Defendants' many statements about VERI's investment potential, investors reasonably hoped to make profits from their passive investments in VERI, as investors' own statements in chat forums and emails show. *See* SEC Br. at 9-10. In response, Defendants proffer eleven declarations—ten by investors who live abroad (*see* D.E. 21, 22, 23, 24, 25, 26, 28, 29, 30, 31)—to show that VERI was bought for "consumption." Def. Br. at 20-21. Much like Defendants' lofty statements about "future" utility, these investors speak about imagined, "future," "over the long-term" uses, "when the platform goes live." *E.g.*, D.E. 22 at ¶ 7; D.E. 24 at ¶ 3; D.E. 25 at ¶ 6; D.E. 26 at ¶ 5; D.E. 29 at ¶ 4; D.E. 31 at ¶ 4. None of these investors

6

describes with any specificity what product they purportedly plan to use and none attests to having used *their own* VERI for anything (not even the two who used unspecified VERI for testing, *see* D.E. 23 at ¶ 3; D.E. 32 at ¶ 6).  And, most tellingly, *six* have made one noteworthy "use" of VERI—they have sold it (without disclosing whether at a profit) or given it away.  *E.g.*, D.E. 22 at ¶¶ 5,6; D.E. 23 at ¶ 3; D.E. 24 at ¶ 2; D.E. 31 at ¶ 2; D.E. 32 at ¶ 2; D.E. 30 at ¶ 3.  In any event, other investors admit they viewed VERI as an investment, despite the advertised "uses."  *See, e.g.*, Decl. of Michael Middleton ¶¶ 3, 6, 9; Decl. of Adeel Arif ¶¶ 4, 5, 9.

Investors' *contemporaneous* expectations from VERI, by contrast, overwhelmingly evidence a reasonable hope to profit from VERI.  Comments on Bitcoin Forum, for example, show that investors: (1) wondered whether VERI was "the better investment in terms of % RoI," Ex. 43 at 2; (2) speculated about VERI's prices rising from $500 to $5,000,00, or from $3,000 to $10,000, *id.* at 5; Ex. 47 at 4-5, and described "no intent to sell VERI until it hits at least 1000 USD," Ex. 46 at 4; (3) said that most VERI purchasers "plan to [sell their tokens]," Ex. 44 at 5; (4) explained how to "get out with a profit – use etherdelta," *id.* at 6; (5) noted that while everyone has been saying "that VERI is 'software' and not a . . . security . . . it's traded and held as one by every[one])," Ex. 48 at 3; and (6) admitted that services and research are "not the only two things I want from owning the token" and would "prefer [VERI] to be easily transferable and exchangeable."  Ex. 42 at 2.  Investors made similar comments on other apps, webpages, and social media.[4]

---

[4] *See, e.g.*, Ex. 49 at 2, 4, 9, 10 (Telegram: investors could "see [VERI] reaching $300-$500 in a very short time period once they hit major exchanges"; it was "nice[] to see high volume already just on etherdelta"; VERI could be "$18,000 . . . next year,"; "how can we find out how high can VERI go??"; boasting that they "sold 2 of my 23 and already made [their] money back,"); Ex. 53 at 1 (Slack: Middleton noting that article about VERI should cause "bump" in token and investor reacting: "I guess [I] should buy more VERI"); Ex. 52 (Twitter: Middleton noting 1063% gain in VERI, investor noting he was "not mad that [his] $214 is now $21,820"); Ex. 50 (YouTube: noting VERI "now trading at about $135 each" and that investor was "Glad [he] bought first day").

7

Other investors, when Middleton claimed that VERI was "not an investment," quickly knew to play along with Middleton's attempted word "sanitation." Admonished by Middleton to use the correct language, one investor facetiously said: "I know . . . You guys are **NOT** selling me a stake in your company . . . It is my opinion . . . that your software tokens will be worth far more in a year than they are today. So I should buy as many licenses ~~in Microsoft Office~~…uh, I mean VERI tokens – as possible right now?" Def. Ex. 9 at 13-14 (alterations in original).

Indeed, four of the eleven investors who submitted sworn affidavits told Middleton's lawyers that

.

Finally, investors' actions, like Defendants', conveyed the true reasons most of them bought VERI. Though during the Offering seven investors tendered 25 VERI Tokens for research, Def. Ex. 32 at 4, nearly two million VERI tokens have traded on EtherDelta alone, *see* Supp. Doody Decl. ¶ 7, and VERI also traded on countless other platforms. *Id.* ¶ 9.

    **C.**    **VERI are Investment Contracts Under *Howey* and Were Not Purchased for Use or Consumption**

As described, VERI Tokens were plainly investment contracts under *Howey*. *See infra* II. Defendants' attempt to reverse this conclusion fails both because the foregoing shows that Defendants and most investors understood VERI as a speculative investment (while Defendants tried to obfuscate that reality), and because the economic realities of the transactions show that VERI was not bought for use or consumption under *Forman*.

In *Forman*, the Supreme Court held that shares in a nonprofit housing cooperative were not investment contracts because they were held for consumption and not as an investment from

8

which one seeks profit. 421 U.S. at 852-53. Far from resting its conclusion on the label attached to the instrument, the Court reaffirmed the long-standing principle that "form should be disregarded for substance and the emphasis should be on economic reality." *Id*. at 848 (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Howey*, 328 U.S. at 298). The Court then noted that "[n]owhere does the [marketing material] seek to attract investors by the prospect of profits" and that purchasers "will be *unable* to resell their apartments at a profit since the apartment must first be offered back [to the issuer]" at the original purchase price. *Id*. at 854 (emphasis added). Thus, the Court concluded, "there can be no doubt that investors were attracted solely by the prospect of acquiring a place to live in," *id*. at 853, and did not consider situations where the investor "is offered both a commodity or real estate for use and an expectation of profits." *Id*. at 853 n.17. In *Grenader v. Spitz*, the Second Circuit, applying *Forman*, similarly held that co-op shares were not investment contracts given that "[t]he shares cannot be transferred to a nontenant" and that "[t]he number of shares that a tenant can purchase is . . . clearly in proportion to the size and location of the apartment . . . ." 537 F.2d 612, 617-618 (2d Cir. 1976).

Courts applying *Forman* have looked to economic reality to ensure that the instrument was actually purchased for use. In *Cameron v. Outdoor Resorts of America*, for example, the Fifth Circuit distinguished the *Forman* co-op shares from those at issue before the court, on the grounds that, because investors had been sold multiple units, the purchasers "manifestly could not use" all of the units. 608 F.2d 187, 193 (5th Cir. 1979). Similarly, in *SEC v. SG Ltd.*, the First Circuit rejected the contention that, under *Forman*, an instrument marketed as a "game" that users could play was not an investment contract. 265 F.3d 42, 54 (1st Cir. 2001). While noting that the issuer's "repeated disclaimers are [not] irrelevant," the First Circuit pointed to "additional representations . . . that played upon greed and fueled expectations of profit," such

9

that the "expectation of profits" prong was met. *Id.* at 53-54 (noting that discussing potential returns "constitute[s] a not-very-subtle form of economic inducement" at odds with the bulletin in *Forman* that "nowhere" sought "to attract investors by the prospect of profits" (citing *Forman*, 421 U.S. at 854)).[5] Applying these principles shows that VERI are still investment contracts.

*First*, Defendants' persistent attempt to "sanitize[e]" the word "investment" from their marketing does not change the investments' nature and is contrary to *Forman* itself. "'Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.'" *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (citation omitted); *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

*Second*, Defendants cannot seriously contend that "[n]owhere" does their marketing speak of the possibility of profits in addition to "uses," *Forman*, 421 U.S. at 854, as discussed above in Section II.A. *See SG Ltd.*, 265 F.3d at 54 (noting "not-very-subtle form[s] of economic inducement"). Defendants thus cannot meaningfully distinguish *Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543 (D.N.J. Dec. 10, 2018). There, the court rejected the idea that a token that could be used to pay for the issuer's labor was not an investment contract, given that the issuer had made statements about potential returns and used the token to pay wages, and because the platform had "limited functionality" at the time of the ICO, all factors present here.

*Third*, Defendants did not limit the transferability of VERI in any meaningful way, unlike the co-op share issuers in *Forman* and *Grenader*. Instead, Defendants sold any number of VERI to any buyer and made them freely transferable at any price, two facts fundamentally inconsistent with true consumptive use. *Outdoor Resorts*, 608 F.2d at 193.

---

[5] Courts have held that "even where investments are made primarily for other reasons," they satisfy the third *Howey* prong. *SEC v. Feng*, No. 15 Civ. 9420, 2017 WL 6551107, at *5 (C.D. Cal. Aug. 10, 2017) (purchaser of EB-5 visa purchased an investment even though he was "also motivated . . . to obtain permanent residency").

10

The Second Circuit has also applied these principles to find that even sales of tangible items with consumptive use are securities. In *Glen-Arden Commodities, Inc. v. SEC*, for example, defendants purported to sell "commodities consisting of casks of . . . whisky" and promised that they would handle selecting the best whiskey casks. 493 F.2d 1027, 1029 (2d Cir. 1974). The Second Circuit held that the sales of the casks were investment contracts because the "evidence showed that investors never contemplated actual physical possession of the whisky." *Id.* at 1032, 1035. In *SEC v. Aqua-Sonic Products Corp.*, the Second Circuit similarly rejected the contention that the "efforts of others" prong failed simply by the "guile" of a promoter to "insert the requirement that the buyer contribute a modicum of effort." 687 F.2d 577, 584 (2d Cir. 1982). The focus, the Court of Appeals explained, was not on "whether it was somehow possible for an investor to profit" from his own efforts, but, rather, "whether the typical investor who was being solicited would be expected" to exercise such efforts. *Id.* at 582-83 (citing *Howey*, 328 U.S. at 300). The Court thus rejected the contention that a "theoretical right" to make efforts defeated *Howey*'s "efforts of others" prong. *Id.* at 582-84; *see also SEC v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 879 (S.D.N.Y. 1981) (discounting disclaimer that issuer "do[es]n't like to use the term 'investment'"). Both of these cases apply to VERI, as it is clear that most investors never contemplated actual use of VERI and that the typical investor who purchased VERI could not be expected to "use" VERI's promised complex financial machines.

Furthermore, the fact that VERI was sold at prices (and then traded at prices) that fluctuated in a manner inconsistent with using the tokens to buy (non-existent) products and services, also shows that VERI were investments. *See, e.g.*, *Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 470-71 (10th Cir. 1967) (holding that contracts to sell, care, and manage live beavers were investment contracts despite tangible nature of purchase partly because "the beavers as

11

mere animals and not as part of the enterprise did not have a value consistent with the price many of the purchasers paid"). Defendants' repeated emphasis of the secondary market for VERI, *see* Def. Br. at 27-28, also shows non-consumptive intent and an expectation of profits. *See, e.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch*, 756 F.2d 230, 240 (2d Cir. 1985).[6]

Defendants do not address this body of law and simply sweep aside digital asset cases that are uniformly unhelpful to them by arguing that "no court has found a digital token to be a security where, as here, the token had immediate (as well as future) utility." Def. Br. at 21-22. But Defendants glean the wrong lesson from these cases, which show that courts will be vigilant to disingenuous attempts to skirt the registration requirements by applying "sanit[izing]" labels that do not match economic reality. "[S]imply labeling an investment opportunity as 'virtual currency' . . . does not transform an investment contract" into something else. *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *7 (E.D.N.Y. Sept. 11, 2018).[7]

### III. Defendants Have Not Rebutted the Evidence of Their Fraud, Manipulation, and Unregistered Offerings

Defendants offer no genuine facts or argument to dispute at least several of their fraudulent statements. *First*, Defendants materially misrepresented to potential investors that they had sold "$34 million" of VERI Tokens. *See* SEC Br. at 11-12. Defendants still have no answer, *see* Ex. 67 at 17-18, and Middleton, in sworn testimony, claimed that he did not "remember" what he was referring to when he spoke of $34 million worth of sales. Middleton

---

[6] SEC staff has elsewhere summarized the factors derived from the foregoing cases that may guide the inquiry of whether a token is for "reasonable expectation of profits." *See* "Framework for 'Investment Contract' Analysis of Digital Assets," https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[7] Defendants' final attempt to escape the securities laws is to compare VERI (after calling it gift cards, loyalty points, software, and pre-paid fees, among other things) to tickets sold on StubHub. *See* Def. Br. at 20. Commission staff has elsewhere suggested that ticket licenses are typically not investment contracts in part because tickets purchases have true consumptive intent, among other things. *See, e.g.*, *The Ticket Reserve, Inc.*, 2003 WL 22195093 (SEC No-Action Letter) (Sept. 11, 2003). VERI bears little resemblance to tickets or ticket licenses.

Tr. at 705:14–712:6.  *Second*, Defendants materially misrepresented that a "visible distribution" of VERI Tokens with respect to the JSE "deal" had occurred, and Defendants' only answer is not that the distribution actually occurred, but a non-sequitur that "the SEC does not mention its own interactions with the JSE at the time."  Def. Br. at 26.  *Finally*, Middleton falsely tweeted that a "[c]ustomer made large $VERI purchase" and "retain[ed]" him to "'VERItize' medical biz."  SEC Br. at 12 (citing Ex. 6 at 16).  He now implicitly admits the falsity of these statements by stating not that he was "retained" but only that he was "encouraged . . . to develop" a plan.  Def. Br. at 25-26.  Indeed, in sworn testimony, both Middleton and the individual were unequivocal that whatever money she gave Middleton was a loan, not for a VERI purchase or to hire him.  *See, e.g.*, Middleton Tr. at 125:17–128:17, 625:13–626:8; 633:2-23; 639:17–640:15; Johnson Tr. at 47:8-23, 48:19–49:11, 83:7-10, 116:9–117:1; 187:12–188:23.

Defendants have similarly conceded the merits of the Commission's claims under Section 9(a)(2) of the Exchange Act.  Middleton admits that (1) he "entered a number of buy transactions in VERI tokens on EtherDelta," (2) as a result, the "prices went up and down," Def. Br. at 28, and (3) he wanted to "encourage[] small purchasers to buy tokens on" EtherDelta and thus traded to "help improve EtherDelta's liquidity" so he could it use as price discovery for his own products.  Middleton Decl. ¶¶ 39, 40.  These admissions, in particular the concession that placing trades on EtherDelta eventually inured to Middleton's pecuniary interest, "'one of the hallmarks of manipulation,'" *SEC v. Schiffer*, No. 97 Civ. 5853, 1998 WL 307375, at *5 (S.D.N.Y. June 10, 1998) (quoting *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 376 (S.D.N.Y. 1998), *aff'd* 155 F.3d at 129) (granting asset freeze), establish the SEC's claim.  *See* 15 U.S.C. § 78*i*(a)(2).

Nor do Defendants dispute that their VERI offers and sales (including on EtherDelta) were unregistered, for purposes of Section 5 of the Securities Act, as they were not.  *See* Ex. 73.

13

**IV.     The Court Should Impose an Asset Freeze To Preserve Investor Funds**

An asset freeze is critical here given Defendants' diversion of assets, frequent transfers of money abroad, and the obscurity of blockchain asset transfers.  *Unifund*, 910 F.2d at 1041.

*First*, Defendants ask that the Court unfreeze their assets so that they can continue diverting VERI Offering proceeds for a venture that has nothing to do with the "Use of digital assets" of the Offering.  *See* Ex. 8.  Middleton has already had ample enjoyment of fraudulently-obtained funds, having turned more than $6.6 million of the Offering proceeds into fiat, of which more than $2.3 million has gone to the account of another entity, "Veritaseum Assets LLC," Supp. Daniello Decl. ¶¶ 11, 23, from which he is operating "VeGold."  This activity has nothing to do with "proprietary research" or developing a system of "'peer to peer' exchanges."  Def. Br. at 6.  Nor are these activities "Gold exposure pools" or purchases of "1 yr. $50K of Gold exposure" for VERI holders.  The VeGold business is simply Middleton and his new companies, including a "broker-dealer" called "Veritaseum Securities," trading directly with purchasers for their own proprietary account and/or interposing themselves between others' transactions.  The fact that VERI holders can purchase VeGold at a discount is not an "additional" form of "value" for the VERI holders, but appears to be one of the limited options still available to VERI holders, now that Middleton has abandoned the projects in which they invested.[8]  And when would-be holders of gold (who do *not* need to hold VERI) purchase VeGold from Middleton, the proceeds go back to Defendants' accounts, Doody Decl. (D.E. 5) ¶¶ 27-28 (and Middleton has, since the

---

[8]     Middleton seeks to blame the SEC for his abandoning the "VeADIR" (as he blames the CFTC for his abandoning his prior venture).  *See* Middleton Decl. ¶ 16 & Def. Ex. 5.  Middleton's purported regulatory concerns did not stop him from raising "angel" capital for his venture in 2014, 2015, and 2016, Middleton Decl. ¶ 12, nor from raising millions in 2017.  Nor does Middleton explain why, after meeting with the SEC, he did not seek to "fix" whatever regulatory issues may have existed over "VeADIR," instead of abandoning that project.  The Court should disregard Middleton's attempt to shift blame and to focus on irrelevant issues.  *See SEC v. Cuban*, 798 F. Supp. 2d 783, 794-95 (N.D. Tex. 2011) ("[w]hen the focus of the litigation shifts from the defendants' alleged misconduct to the conduct of both the defendant and the SEC, delay . . . [is] virtually certain to follow").

Offering, transferred at least $1.7 million to personal accounts, Supp. Daniello Decl. ¶ 16). Without a total asset freeze, Defendants will continue to dissipate Veritaseum's assets and eliminate the Court's ability to grant meaningful monetary relief. *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010).

*Second*, Middleton has many international contacts. His financial analyst is in India, and his lead developer is in Poland but refuses to disclose the methods he uses to convert the ETH he has received (an amount he purports not to remember). *See* Supp. Suthammanont Decl. ¶¶ 45(b), 46.

Since the Offering, Middleton has caused Veritaseum to pay over $930,000 to overseas accounts, as well as unknown amounts of ETH. *See* Supp. Daniello Decl. ¶ 28; Supp. Suthammanont Decl. ¶ 45. These overseas contacts and Middleton's history of transferring funds abroad create a concern that he may attempt to transfer assets beyond the jurisdiction of the United States. *See SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 419 (S.D.N.Y. 2001) (ordering freeze).

*Finally*, given that Middleton conducts much of his business on blockchain, monitoring his asset movements would be particularly difficult without an asset freeze. *E.g.*, Second Doody Decl. ¶¶ 10-12. Middleton claims he is unable to provide a complete list of the addresses where he has transferred Offering proceeds. Middleton Tr. at 1304:18—1306:1, 1310:15-23; Ex. 67 at 21. Moreover, to convert digital assets into fiat currency, Middleton can route it through dozens of digital asset platforms, many of which are not regulated by any U.S. agency and are offshore.

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's Application for preliminary injunctive relief against Defendants.

15

Dated: New York, New York
      August 22, 2019

                                               /s/ JGT
Jorge G. Tenreiro
Victor Suthammanont
Karen E. Willenken
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

16