**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

                                        **Plaintiff,**                    **19 Civ. 04625 (WFK) (VMS)**

         **- against -**

**REGINALD ("REGGIE") MIDDLETON,**                     **ORAL ARGUMENT**
**VERITASEUM, INC., and**                              **REQUESTED**
**VERITASEUM, LLC,**

                                        **Defendants.**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF FRCP 60(D)3 MOTION TO**

**VACATE ORDER FOR FRAUD UPON THE COURT**

**/s Franklin Jason Seibert**
Franklin Jason Seibert
Seibert Law
3202 Coral Ridge Dr
League City, TX 77573
971-235-5764
jason@seibert-law.com
*Counsel for Defendants*

May 30, 2025

# TABLE OF CONTENTS

I.    INTRODUCTION: The Securities and Exchange Commission fabricated evidence that Reggie Middleton stole investor assets in order to obtain an asset freeze. .............................. 1

I.    FACTUAL BACKGROUND ............................................................................. 4

    A.    Case Overview .............................................................................................. 4

    B.    The SEC's Allegations and Supporting Evidence .................................... 8

    C.    The Consent Order: Final Judgment Terms ...........................................14

    D.    The SEC Chilled Witnesses for the Defense ...........................................15

II.    ARGUMENT ................................................................................................ 16

    A.    LEGAL STANDARD ...................................................................................17

    B.    FRCP 60(d)(3): Fraud Upon the Court ...................................................17

       1.    Intentional Misconduct by Officers of the Court: .............................18

       2.    The Corruption of Judicial Integrity .................................................19

       3.    Clear and Convincing Evidence of a Scheme ....................................20

       4.    Materially Affecting the Adjudication .................................................21

    C.    Neither Laches Nor Settlement Bars Relief ...........................................21

III.    CONCLUSION ............................................................................................ 22

## I.  INTRODUCTION: The Securities and Exchange Commission fabricated evidence that Reggie Middleton stole investor assets in order to obtain an asset freeze.

Defendants Reginald ("Reggie") Middleton, Veritaseum, Inc., and Veritaseum, LLC (collectively, "Defendants") move this Court under Federal Rule of Civil Procedure 60(d)(3) to vacate the Final Judgment entered on October 31, 2019 (D.E. 61), alleging the Securities and Exchange Commission (SEC) committed fraud upon the court through a calculated scheme that undermined judicial integrity. This misconduct, executed by SEC officers Jorge G. Tenreiro and Victor Suthammanont—signatories to the complaint and the memorandum in support of the asset freeze  (D.E. 1, D.E. 7) —violated two bedrock principles: the government must avoid fraudulent schemes that deceive judicial proceedings (*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)) and act honorably when exercising its authority (*SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 317 (5th Cir. 1981)). The SEC's actions breached these duties, corrupting the process that imposed $8,474,137 in disgorgement and a $1,000,000 civil penalty on Reggie Middleton (D.E. 61 ¶ VII).

To decipher the SEC's scheme the Court will have to examine the docket, and compare the complaint, the supporting declarations of the SEC attorneys and their experts, the memorandum in support of the asset freeze and the transcript of the TRO hearing, and combine the entirety of them to distill a theme that in the days after the notification of an upcoming Wells notice: Reggie Middleton was secreting and dissipating alleged victim investor assets to his personal accounts at a digital exchange.

This narrative was the driving factor in the SEC's argument for the asset freeze, and it was a complete fabrication.

These acts by the SEC are eerily similar and constitute a pattern that was recently rooted

1

out in *SEC v. Dig. Licensing Inc.,* 2-23-cv-00482 (D. Utah, 2024) where the SEC fabricated or misrepresented evidence when obtaining a TRO and asset freeze against yet another cryptocurrency/blockchain-based project. The SEC claimed that Dig. Licensing, Inc (hereinafter "*DebtBox*") in support of its motion to freeze assets claimed that *DebtBox* had: 1) closed 33 bank accounts in 48 hours; liquidated $720,000 in investor funds; and 3) were moving operations overseas to evade US regulations. In fact, as the court found that the statements were materially false and misleading, and directly impacted the court leading to the issuance of the TRO: 1) *DebtBox* had not closed 33 bank accounts in 48, but only 13 had been closed, by banks themselves and not the defendants 2) the $720,000 claim of investor funds withdrawn was not supported by evidence; and 3) the company was not moving overseas to avoid US regulation and that the SEC had taken the statement wholly out of context and misled the intent. The Federal Judge sanctioned the SEC for $1.8 million dollars stating that the SEC had a special duty to act with integrity (citing Utah Rules of Professional Conduct 3.3).

The Rules and Abbott's duty of candor to the court do not leave to her to decide whether a false statement must be corrected. Welsh made a false statement to the court that was integral to the Commission's showing of irreparable harm in a hearing for an ex parte TRO. Abbott knew it was incorrect the moment Welsh said it. Her duty required her to correct it.

There is another troubling aspect to Abbott's explanation for her failure to correct the false statement. According to the Commission, she did not think the statement was material because of "the other evidence the Commission had presented of an ongoing fraudulent offering."**318** This suggests a misunderstanding of the judicial process. It has not been determined whether Defendants engaged in a fraudulent offering. That is for a trier of fact to decide at the conclusion of the litigation. That the Commission files a complaint does not conclusively [*64] prove, nor serve as evidence of, fraud or anything else. The contents of a complaint ordinarily are nothing more than unproven allegations. This underscores the extraordinary nature of the relief the Commission obtained here and the grave harm suffered when a party abuses the judicial process to obtain that relief. Before a party has an opportunity to respond to the allegations against it, long before the truth of those allegations is determined, the court grants a TRO, freezes assets, and appoints a receiver to seize control of entire companies—all without notice to the affected

party. Given the profoundly significant consequences of this relief, the court must trust counsel take their duties to the court seriously. Abbott's explanations reflect a misapprehension that Commission attorneys are not only exempt from binding ethical obligations but also operate above the traditional adjudicative process.

*SEC v. Digit. Licensing Inc.* 2:23-cv-00482-RJS-DBP (D. Utah March 18, 2024), 2024 U.S. Dist. LEXIS 48151.

The *DebtBox* Court went on to consider that Federal Courts possess inherent powers to preserve the integrity of the judicial proceedings by punishing abuses of the judicial process through the crafting and imposition of appropriate sanctions. *Id* at 278. Further, the Court discussed that if neither a statute nor a rule (referring to Rule 11) "…is up to the task, the court may safely rely on its inherent power." *Id* at 284.

Just like in *DebtBox*, the SEC in this case made fabricated materially false or misleading statements to obtain an asset freeze that crippled Defendants. Further, the fabrication of evidence relating to the ownership of the Kraken exchange account (personal vs. corporate), is the very kind of deception that *Hazel-Atlas* and FRCP 60(d)3 was designed to combat.

The SEC will contend that 5.5 years after a consent judgment is too long to vacate an order under FRCP 60(d)(3), that laches should apply, or that the interests of justice are not served by granting Defendants' motion. These arguments do not matter in light of FRCP 60(d)(3) and its strict adherence to judicial integrity. As instructive in *DebtBox* and in *Hazel-Atlas* (and its progeny), the duty of an officer of the court when seeking extraordinary relief is heightened, nearly to the point of strict liability. Accordingly, when a party seeks relief that would result in freezing the very assets the opposing party would rely on to pay defense counsel to defend themselves, the party (here the SEC) must come forward with the truth, and the duty to tell the truth extends to not just the attorney making the statement, but to every other attorney involved in the case. It does not matter how long it took Defendants to bring this motion, as FRCP 60(d)(3) has no time limit. This

was specifically contemplated when FRCP 60(d)(3) was created and FRCP 60(b)(3) maintained a 1-year limitation. FRCP 60(b)(3) is fraud upon a party. FRCP 60(d)(3) is fraud upon the court. Defendants cannot *waive* the court's right to not be lied to. It is not for the Defendants to correct the record in the face of a lie from the SEC, it is the duty of the SEC, when seeking this particular relief, to be truthful. The SEC was not truthful.

Therefore, Defendants ask the Court to vacate the judgment (D.E. 61), return Defendants' assets that were frozen and surrendered, and dismiss the allegations of the complaint (without prejudice). Further, Defendants seek reasonable attorney fees from October 2017 (the first time that the SEC was put on notice that it had a duty to behave honorably) to the present date, to include future fees and costs incurred in obtaining the requested relief. In the alternative to determination on the pleadings of this matter, Defendants request the Court hold an evidentiary hearing to determine the extent of the SEC's actions to include limited discovery and testimony.

## I.    FACTUAL BACKGROUND

Defendants Reginald ("Reggie") Middleton, Veritaseum, Inc., and Veritaseum, LLC (collectively, "Defendants") allege that the SEC engaged in a pattern of misconduct that tainted the judicial process leading to the Final Judgment entered on October 31, 2019 (D.E. 61). This section provides a history of the case, the SEC's allegations and evidence, the terms of the Final Judgment, and the events demonstrating how the SEC's actions, executed by officers Jorge G. Tenreiro and Victor Suthammanont, violated its duties to avoid fraudulent schemes (*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)) and act honorably (*SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 317 (5th Cir. 1981)).

### A.    Case Overview

4

On August 24, 2017, the SEC and attorney for Defendants, F. Jason Seibert, first discussed SEC's file (NY-9624) of Veritaseum, Inc., Veritaseum, LLC and Reginald ("Reggie") Middleton (collectively, "Defendants") and Defendants cooperation by voluntary submission of documents and testimony. Despite Mr. Seibert's assurances of cooperation, Mr. Tenreiro threatened to issue subpoenas. In light of the subpoena threat, Mr. Seibert requested information regarding any Formal Order of Investigation. That request for the formal order of investigation went unanswered. *See* Seibert Decl. ¶ 2 and Exhibit 1 attached thereto.

On or about September 17, 2017, Mr. Seibert contacted Mr. Tenreiro with updated information and began discussions about voluntary administrative orders to resolve the investigation as well as schedule for additional production. Again, the request for information regarding any Formal Order of Investigation went unanswered. *See* Seibert Decl. ¶ 3, 4 and Exhibit 2 attached thereto. On or about September 27, 2017, Mr. Seibert informed Mr. Tenreiro that while Defendants were still willing to resolve the issues with an administrative order, any continued requests for information would have to be done so with a Formal Order of Investigation. *See* Seibert Decl. ¶ 5 and Exhibit 3 attached thereto.

On or about October 3, 2017, Mr. Tenreiro emailed Mr. Seibert a copy of a Subpoena from the SEC and sought authorization for electronic service. Upon request of Mr. Seibert for a copy of the Formal Order of Investigation, Mr. Tenreiro stated that he needed to see "magic language" in order to provide it. *See* Seibert Decl. ¶6 and Exhibit 4 attached thereto.

Between October 3, 2017, and October 24, 2017, Mr. Tenreiro and Mr. Seibert exchanged several emails, specifically about changes to the SEC Enforcement Manual, and the failure of the SEC to comply with recent changes or make public the internal modifications to their own procedures.

*On or about October 24, 2017, Mr. Seibert put the SEC and Mr. Tenreiro on notice that the actions of the SEC and himself did not comply with the duty to behave honorably.* See Seibert Decl. ¶ 7, 8 and Exhibit 5 attached thereto.

Further, the SEC acknowledged that there in fact was an unpublished modification to the Enforcement Manual that impacted Defendants Due Process rights, but the SEC and Mr. Tenreiro refused to provide those updates. *See* Seibert Decl. ¶ 9 and Exhibit 5 attached thereto. Then, on October 26, 2017, with full knowledge that no subpoena had actually been served upon Defendants, Mr. Tenreiro demanded a response to the unserved subpoena within 24 hours or else he would pursue civil enforcement. *See* Seibert Decl. ¶ 10 and Exhibit 6 attached thereto.

On November 16, 2017, Mr. Middleton appeared in response to the subpoena to give testimony at the offices of the SEC in New York. After the proceedings, Mr. Seibert sent follow up email to Mr. Tenreiro, Mr. Birnbaum and Ms. Szczepanic outlining: 1) the unacceptable and unprofessional behavior of Mr. Tenreiro who openly mocked Mr. Middleton; 2) that Defendants were still waiting for any written publication regarding the modification of the enforcement manual, and 3) the refusal to allow Defendants or counsel to request or take a break was completely against any and all procedure and that if a break were allowed, that Mr. Tenreiro would have been spared the embarrassment of impeaching Defendant with a clearly false signature on a fabricated document. *See* Seibert Decl. ¶ 12 and Exhibit 7 attached thereto. In response, Ms. Szczepanic stated she would look into the matter, refused to consider resolution, and requested more documentation. *Id.*

On or about January 3, 2018, Mr. David Kornblau assumed legal representation of Defendants matter. *See* Seibert Decl. ¶ 13 and Exhibit 8 attached thereto. Between August 24, 2017, and August 11, 2019, the SEC never provided a theory of their case, never issued allegations

of fraud of any kind, nor attempted to exercise their administrative powers despite repeated attempts of Defendants to engage in a cooperative and reasonable manner to resolve any and all matters administratively. *See* Seibert Decl. and previously filed Kornblau Decl. D.E. 20.

On August 12, 2019, the SEC filed a complaint (D.E. 1) and a motion, memorandum and supporting declarations (D.E. 7, D.E. 2 and D.E. 3) against Defendants, alleging securities violations tied to VERI Token sales, signed by Tenreiro and Suthammanont. The SEC also filed declarations from Roseann Daniello (D.E. 4), and Patrick Doody (D.E. 5). At the TRO hearing before Judge LaShann DeArcy Hall, Tenreiro, while under his duty of candor according to Model Rule 3.3 (and associated New York Rule 3.3), made representations and sought an asset freeze. As justification for the extraordinary relief, Mr. Tenreiro cited Reggie Middleton's July 30-31, 2019, transfers of over $2 million as dissipation risks following a Wells notice on July 26, 2019 (*See* Seibert Declaration Exhibit 9 TRO Hearing Transcript (hereinafter 'Transcript') p. 10, lines 15-25). Mr. Kornblau, Defendants' counsel, countered that these alleged transfers were routine, occurring every six months for eighteen months and disclosed during a two-year SEC investigation (Transcript p. 11, lines 8-17). The same day, Judge Hall granted a modified TRO, freezing business assets—including blockchain addresses with an intermediary—but not personal accounts (Transcript p. 35, line 11 - p. 39, line 25), ordering expedited discovery and setting a preliminary injunction hearing for August 22, 2019, before Judge Pamela Chen (Transcript p. 46, line 23 - p. 47, line 25). This ruling, Defendants assert, stemmed from the SEC's deceptive omission of the transfers' routine nature and blatant and calculated lie that those funds were transferred to Mr. Middleton's personal overseas account.

On August 19, 2019, Defendants opposed the preliminary injunction (D.E. 19), submitting eleven declarations asserting VERI Tokens were utility tokens for the VeADIR platform (D.E. 19

at 20-21). Further, Defendants contended that the transfers were not to Mr. Middleton's personal account, but an account in the name of the company, and that all of the transfers were in the ordinary course of business as it had been for the previous two years (approximately) during the pre-Wells investigation. The SEC replied on August 22, 2019 (D.E. 46), with an affidavit from Michael Middleton claiming investment losses (D.E. 42 ¶¶ 6-7) and a supplemental Daniello declaration (D.E. 44) with detailed accounting entries that appeared to support Defendants' statements that the transfers were to normal business counterparts as well as a supplemental declaration from Mr. Doody (D.E. 43) acknowledging that the overseas account was in fact a business account and not the account of Mr. Middleton personally. The matters were never argued before the court and no findings of fact were ever made.

Settlement negotiations followed, resulting in a consent judgment filed November 1, 2019, entered as the Final Judgment on October 31, 2019 (D.E. 61). Defendants contend this outcome was coerced by the SEC's misconduct before the Court, which froze Defendants' assets based on a lie, that rendered Defendants unable to afford to be able to proceed with legal fees to continue its fight. In effect, but for the SEC obtaining the asset freeze, Defendants would have been able to defend the allegations and proceed in the normal course of due process.

### B.    The SEC's Allegations and Supporting Evidence

The SEC's complaint alleged that Defendants raised approximately $14.8 million through an unregistered ICO and subsequent sales of VERI Tokens from April 2017 to February 2018 (D.E. 1 ¶¶ 3-6). It asserted violations of Sections 5(a) and 5(c) of the Securities Act for unregistered securities sales (¶¶ 51-57), Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act (and Rule 10b-5 thereunder) for fraudulent misrepresentations about Veritaseum's products, investor demand, and business ventures (¶¶ 63-97), and Section 9(a)(2) of the Exchange

Act for Reggie Middleton's alleged manipulation of VERI Token prices (¶¶ 98-107). The SEC further claimed that Reggie Middleton dissipated investor proceeds, transferring approximately $520,000 to personal accounts for personal use (¶¶ 108-111). Defendants argue that this narrative was a fraudulent construct (*Hazel-Atlas*, 322 U.S. at 245) and a dishonorable exaggeration (*ESM Government Securities*, 645 F.2d at 317), designed to secure unwarranted punitive relief.

The SEC supported these allegations with evidence that Defendants challenge as tainted by fraud and dishonor:

a.      **Tenreiro Declaration (D.E. 2):** Filed on August 12, 2019, Jorge G. Tenreiro, as Senior Trial Counsel, asserted that Defendants raised $14.8 million through the sale of VERI Tokens, liquidated $5.2 million from approximately 20,800 ETH Tokens obtained in the ICO, and transferred over $2 million in digital assets on July 30-31, 2019 to Middleton's personal accounts, suggesting an imminent risk of dissipation (¶ 8). This fabrication transformed a legitimate business practice into a fraudulent scheme (*Hazel-Atlas*, 322 U.S. at 245) and breached the SEC's duty to behave honorably (*ESM Government Securities*, 645 F.2d at 317).

b.      **Suthammanont Declaration (D.E. 3):** Also filed on August 12, 2019, Victor Suthammanont, Senior Trial Counsel, detailed alleged misrepresentations, including Reggie Middleton's claims about a partnership with the Jamaican Stock Exchange (¶¶ 60-61), and dissipation, noting $2.2 million in ETH transfers in July 2019 (¶¶ 86-92). Suthammanont authenticated 92 exhibits, including Reggie Middleton's prior testimony (Exs. 34-37) and Veritaseum marketing materials (Exs. 1-3), to bolster the SEC's case (¶¶ 12-52). However, he remained silent on the routine nature and prior disclosure of the July 2019 transfers, a fact Kornblau highlighted at the hearing (Transcript p. 11, lines 8-17). Mr. Kornblau further pointed this out in his filed declaration on August 19, 2019 (D.E. 20 p 2, 3). This selective presentation

furthered the SEC's fraudulent narrative (*Hazel-Atlas*, 322 U.S. at 245) and dishonorable conduct (*ESM Government Securities*, 645 F.2d at 317), concealing exculpatory context that undermined its dissipation claim. Suthummanont knew that the transfers were routine and knew that the Kraken account was not a personal account, but did not correct the record nor modify his testimony at any point in time.

c. **Daniello Declarations (D.E. 4, 44):** Roseann Daniello, an SEC Staff Accountant, provided financial tracing in her initial declaration (D.E. 4, August 12, 2019), identifying $1,527,458.19 in cryptocurrency deposits from April 2017 to May 2018, with $75,000 transferred to Reggie Middleton's personal Citibank account (¶ 22) and $1,000,000 received from Lorna Mae Johnson (¶ 23). Her supplemental declaration (D.E. 44, August 22, 2019) expanded this analysis, tracing $6,664,922.08 in deposits through July 2019 (¶ 11), with $1,714,151.25 net transferred to Reggie Middleton's personal accounts (¶ 16), and $1,410,788.43 paid to Dillon Gage for precious metals (¶ 23). Neither declaration addressed the July 2019 transfers' routine occurrence every six months over eighteen months, nor their full disclosure to the SEC, a fact Kornblau raised at the hearing (Transcript p. 11, lines 8-17). Daniello's silence on this context contributed to the SEC's fraudulent scheme (*Hazel-Atlas*, 322 U.S. at 245) and dishonorable omission (*ESM Government Securities*, 645 F.2d at 317), reinforcing a misleading narrative of dissipation. In addition, in her August 12, 2019 Declaration, Daniello represented as certain fact totals for various international wires, which she later admitted were incorrect (¶ 30). Below are key excerpts from Daniellos's declarations exposing unreliability and inaccuracy of her original declaration:

i. **August 22 Declaration (Doc. 44) ¶ 15–17 (Pages 5–6):** Incomplete documentation / "personal account" *assumptions*.; ¶ 18–20 (Pages 6–7): Explicitly labeled "errors," including amounts incorrectly stated on August 12.; ¶ 19–21 (Pages 7–8): Large numeric corrections to wire

totals ($269,626.97 vs. $371,764.47 vs. $523,914).

    **ii.**   **August 22 Declaration (Doc. 44) ¶ 22–24 (Pages 8–9):** Admission that the August 12 data was "preliminary," with additional new records that changed the entire analysis. The SEC attorneys, when seeking extraordinary relief, ran to the courthouse with incomplete financial analysis, claimed dissipation, and knew that the information was not correct and worse, not complete; however, they sought and obtained extraordinary relief based on specific lies, omissions and obfuscations to the court.

   **d.**  **Doody Declaration I (D.E. 5):** Filed August 12, 2019, Patrick Doody, an SEC Blockchain Data Scientist, falsely labeled a Kraken account as "Middleton's" (¶¶ 24, 27, 29, 30, 31), claiming Reggie Middleton, not Veritaseum, LLC,  liquidated $4,900,605 from 19,142 ETH Tokens (¶ 24) and received $735,757 in July 2019 (¶ 34), implying personal control and dissipation of investor funds. Based on D.E. 6 filed simultaneously with Doody's Declaration (D.E. 5), the SEC knew that the account belonged to Veritaseum, LLC.  Notably, neither attorney for the SEC filed a notice of errata, made any correction in subsequent filings, or made any attempt to correct their sworn testimony or direct statements to the Court. *Hazel-Atlas* makes it clear, as did *DebtBox*, that the duty is on the officer of the court that made the false statement to correct it. This fraudulent act (*Hazel-Atlas*, 322 U.S. at 245) and dishonorable misrepresentation (*ESM Government Securities*, 645 F.2d at 317) exaggerated the acts to claim dissipation and personal gain to wrongfully obtain the TRO.

   **e.** **Michael Middleton Declaration (D.E. 42):** Filed August 22, 2019, Michael Middleton claimed he purchased VERI Tokens as an investment and suffered losses (¶¶ 6-7), a declaration the SEC used in its reply brief to rebut Defendants' utility token defense (D.E. 46 at 6-8). The SEC failed to disclose Michael Middleton's known Traumatic Brain Injury and post-coma incapacity

and also potential memory loss from alcohol abuse. Based on deposition testimony given by Michael Middleton, Mr. Suthammanont had multiple contacts with Michael Middleton prior to the submission of the Michael Middleton's filed declaration (D.E. 42) that was provided by the SEC for Michael Middleton to sign. *See* Seibert Decl. ¶ 15 and Exhibit 10 Deposition Transcript Pages 1 through 25 attached thereto.  What is clear from Michael Middleton's deposition transcript is that he is not certain about much of any part of this matter, suffered an injury that impaired his memory and brain function, received alcohol abuse treatment that potentially impacts his memory, and the SEC used this man to taint the record before the Court with what little evidence they could to support their claims that Defendants sold investments to counter the multiple declarations filed by Defendants that purchases of VERI tokens were utilities. D.E. 42 transformed an unreliable witness into a pivotal piece of evidence. Despite the fact it was never argued before the Court, the SEC's intent to use it in this case is evident of the SEC's fraudulent scheme (*Hazel-Atlas*, 322 U.S. at 245) and dishonorable breach of candor (*ESM Government Securities*, 645 F.2d at 317).

f. **Tenreiro TRO hearing representations:**    At the TRO hearing, Tenreiro reiterated the same claims of dissipation to Middleton personal accounts, emphasizing the transfers as evidence of Reggie Middleton's intent to evade oversight (Transcript p. 10, lines 23-25; p. 2, lines 14-20). Critically, he omitted that these transfers were routine business transactions, occurring approximately every six months for the preceding eighteen months, and fully disclosed to the SEC during its two-year investigation a fact raised by Kornblau (Transcript p. 11, lines 8-17) and that had been previously disclosed to Tenreiro in email a mere ten days prior to the hearing. *See* Kornblau Decl. D.E. 20 p. 2, 3.

In order to discover the intricacy of the SEC's fraudulent scheme, Defendants suggest the Court compare the following documents side by side: D.E. 1, D.E. 2, D.E. 5, D. E. 6, D.E. 7, D.E.

9 and the Transcript of the TRO Hearing on August 12, 2019 attached as Exhibit 9 to the Seibert Decl.

The narrative throughout, and the justification ultimately for the asset freeze, was that on or about July 30 and July 31, 2019, Mr. Middleton transferred assets to his personal digital exchange trading account and that there was nothing that the SEC could do to prevent Mr. Middelton from stopping the flow of funds in these crypto currency addresses.

| D.E. 1, ¶ 119, 120 | – July 30, Middleton transfers funds after being notified of an enforcement action to his personal account; D.E. 2, ¶ 8 – funds transferred in recent days to digital asset trading platform accounts whose control may become untraceable; |
|---|---|
| D.E. 5, ¶ 30, 31, 32, 33 | – July 30 and 31, 2019, funds transferred to a Kraken account that "Kraken has indicated that the owner of this address is one of Either Reginald Middleton or Eleanor Reid." |
| D.E. 7, page 16 | July 30th Middleton transferred 10,000 ETH to a personal account at a digital asset trading platform citing Doody Decl. ¶¶30-33. |
| Transcript of the TRO Hearing | Mr. Tenreiro makes multiple arguments that in the days prior to the TRO, that Mr. Middleton was transferring cryptocurrency to digital trading accounts for which there was no ability to control his activities, or stop trading. Pages 25, 27. – "… he can use a foreign exchange, convert that into currency and from there transfer it to some sort of account." (pg. 27, line 22-23)." "The blockchain addresses are I suppose business addresses. The only person who controls that is him. He has the key." *Id.* Further, Mr. Tenreiro argues in favor of the Intermediary due to the risk of the personal blockchain assets moving. Page 29, 30. |
| Transcript of the TRO Hearing, Page 29, 40 and D.E. 6 and D.E. 9 | Transcript of the TRO Hearing, Page 29, 40 and D.E. 6 and D.E. 9 – COMPARE SIDE BY SIDE. During the TRO Hearing Judge Hall is going down the list of accounts that are personal and corporate/business of D.E. 6 as she's decided to not freeze Mr. Middleton's personal accounts, but instead only those of the business. Page 40, line 17: "[The Court] Now, can someone tell me with respect to the Kraken account, is that a traditional bank account? Mr. TENREIRO: It's not a traditional bank account, ***but it's an account that we can serve a freeze order on.*** *Emphasis added.* |

*Compare to* D.E. 6 and 9 the TRO, Appendix attached thereto of accounts and account owners

(Kraken's owner is listed as Veritaseum, LLC. NOT Reginald Middleton).

### C.     The Consent Order: Final Judgment Terms

The Final Judgment (D.E. 61), entered on October 31, 2019, resolved the case without Defendants admitting or denying the allegations, except as to jurisdiction, a resolution Defendants argue was the culmination of the SEC's fraudulent schemes and dishonorable conduct, in stark violation of *Hazel-Atlas* (322 U.S. at 245) and *ESM Government Securities* (645 F.2d at 317). The judgment imposed severe penalties, reflecting the SEC's success in leveraging its deceptive tactics:

**Injunctions (¶¶ I-IV):** Permanently enjoined Defendants from violating Sections 5 and 17(a) of the Securities Act, and Sections 9(a)(2) and 10(b) of the Exchange Act (and Rule 10b-5 thereunder), prohibiting future securities offerings and fraudulent acts. These broad prohibitions effectively barred Defendants from engaging in any securities-related activities, a scope Defendants contend was unjustified absent the SEC's fraudulent narrative.

**Bans (¶¶ V-VI):** Prohibited Reggie Middleton from serving as an officer or director of any issuer required to file reports under Sections 12 or 15(d) of the Exchange Act (¶ V) and barred Defendants from participating in any offering of digital securities (¶ VI). These bans crippled Reggie Middleton's ability to lead Veritaseum and curtailed the company's operations in the cryptocurrency space, a punitive measure rooted in the SEC's dishonorable misrepresentations.

**Monetary Relief (¶ VII):** Ordered $8,474,137 in disgorgement (jointly and severally), representing alleged profits from the ICO and sales, plus $582,535 in prejudgment interest (totaling $8,474,137), and a $1,000,000 civil penalty assessed against Reggie Middleton under Sections 20(d) of the Securities Act and 21(d)(3) of the Exchange Act. These amounts were deemed satisfied by the transmission of Frozen Metals (¶ VIII), Frozen Bank Assets (¶ XVI), and Frozen Digital Assets (¶ XVII), including precious metals held by Diamond State Depository (Appendix A), bank

accounts at Citibank, Bank of America, and J.P. Morgan Chase (¶ XVI), and digital assets like Ether and Bitcoin (¶ XVII). This monetary relief was inflated by the SEC's fraudulent portrayal of Reggie Middleton's actions, far exceeding what honorable conduct would have warranted.

**Fair Fund (¶¶ VII-XVII):** Established the Veritaseum Fair Fund to distribute collected disgorgement, interest, and penalties to alleged victims, managed by Holland & Knight as Distribution Agent (¶ X) and Miller Kaplan as Tax Administrator (¶ XI), with detailed procedures for asset management, distribution, and reporting (¶¶ VIII-XVII). This fund, while framed as investor protection, was predicated on a narrative Defendants assert was fraudulently constructed, dishonorably imposing liability where none was justly due.

The Final Judgment, Defendants contend, was not a fair resolution but a punitive outcome coerced by the SEC's systematic breach of *Hazel-Atlas*'s prohibition on fraudulent schemes and *ESM Government Securities*'s mandate for honorable conduct. The TRO's pressure (Transcript p. 35, line 11), coupled with subsequent intimidation and concealment, left Reggie Middleton with little choice but to settle, a result that reflects the SEC's manipulation of the judicial process rather than a truthful adjudication of the facts.

### D.     The SEC Chilled Witnesses for the Defense

Since the entry of the Final Judgment, Defendants have uncovered compelling evidence that exposes the SEC's fraudulent schemes and dishonorable conduct, breaching *Hazel-Atlas* (322 U.S. at 245) and *ESM Government Securities* (645 F.2d at 317). This evidence of witness intimidation, gathered between 2024 and 2025, reveal a pattern of deceit and coercion.

After filing the complaint, the SEC intimidated Reggie Middleton's witnesses to silence testimony favorable to the defense, a tactic that breached *Hazel-Atlas*'s prohibition on fraudulent evidence suppression (322 U.S. at 245) and *ESM Government Securities*'s expectation of honorable conduct (645 F.2d at 317). Below is a brief summary of the coercive intimidation tactics

used by the SEC on witnesses with testimony favorable to Reggie Middleton and Veritaseum:

- o **Michael Sheahan (October 21, 2024):** A Veritaseum community member and VeADIR beta tester submitted an affidavit supporting Reggie Middleton in August 2019. The SEC subpoenaed him for a deposition, conducted via video conference due to his spinal surgery, led by Tenreiro, Suthammanont, and Karen Willenken. The session turned "aggressive, abusive, and threatening," with threats of felony charges for his support and YouTube activity (VeTest channel), halting his public advocacy and costing him channel ownership (p. 1-2). Post-surgery, the SEC escalated demands, attempting to seize his devices (p. 2), a coercive act that chilled his participation. *See* Seibert Decl. ¶ 16 and Exhibit 11 attached thereto.

- o **Lloyd G. Cupp III (August 6, 2024):** On June 28-29, 2018, Tenreiro contacted Cupp unsolicited, seeking his testimony against Reggie Middleton as a victim of a Ponzi scheme (¶¶ 1-3). Cupp rejected this, asserting VERI's utility status (¶ 4), but Tenreiro persisted, pressuring him to reconsider (¶ 5). Though not explicitly threatened, this coercion reflected the SEC's dishonorable intent to shape testimony (*ESM Government Securities*, 645 F.2d at 317). *See* Seibert Decl. ¶ 17 and Exhibit 12 attached thereto.

## II.    ARGUMENT

Defendants Reginald ("Reggie") Middleton, Veritaseum, Inc., and Veritaseum, LLC move to vacate the Final Judgment (D.E. 61) under Federal Rule of Civil Procedure 60(d)(3), asserting that the SEC, through officers Jorge G. Tenreiro, and Victor Suthammanont, committed fraud upon the Court. This misconduct violated the SEC's duties to avoid fraudulent schemes (*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)) and act honorably (*SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 317 (5th Cir. 1981)), materially and improperly influencing the October 31, 2019, judgment. Clear and convincing evidence supports this claim, and there is no time limit that would bar this action.

### A.    LEGAL STANDARD

Defendants seek to vacate the Final Judgment (D.E. 61) under Federal Rule of Civil Procedure 60(d)(3), which permits courts to "set aside a judgment for fraud on the court." This equitable remedy addresses: 1) intentional misconduct by officers of the court; 2) that corrupts judicial integrity; 3) through clear and convincing evidence of a scheme; 4) materially affecting the adjudication (*Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988)), governed by two principles: the government must avoid fraudulent schemes (*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)) and must act honorably (*SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 317 (5th Cir. 1981)).

### B.    FRCP 60(d)(3): Fraud Upon the Court

FRCP 60(d)(3) targets fraud by officers of the court that "seriously affects the integrity of the normal process of adjudication" (*Gleason*, 860 F.2d at 559), distinct from FRCP 60(b)(3)'s one-year limit for party fraud. It reflects equity's power to remedy deceit undermining public trust in judicial outcomes, imposing a heightened duty on governmental actors like the SEC. The scope and test for fraud on the court under FRCP 60(d)(3) have been defined and refined through several key cases. Fraud on the court is narrowly construed and applies only to the most egregious misconduct that directly undermines the integrity of the judicial process. It is distinct from general fraud under Rule 60(b)(3) and requires clear and convincing evidence of an unconscionable plan or scheme designed to improperly influence the court. The controlling standard is set forth and fleshed out in the following key cases.

i.    ***Hazel-Atlas Glass Co. v. Hartford-Empire Co.***, **322 U.S. 238, 64 S. Ct. 977 (1944)**: This watershed Supreme Court case established that courts have inherent power to set aside judgments obtained through fraud on the court, even when equitable principles like laches or lack of diligence

17

might otherwise bar relief. The case emphasized that fraud on the court involves misconduct that defiles the court itself, such as fabrication of evidence by an attorney. *See, e.g.*, *Averbach v. Rival Mfg. Co.*, 809 F.2d 1016 (3d Cir. 1987).

ii.    ***United States v. Buck***, **281 F.3d 1336 (10th Cir. 2002)**: The Tenth Circuit, building on *Hazel-Atlas*, clarified that fraud on the court requires [i] a deliberate scheme to defraud the court, [ii] with intent to deceive, and [iii] which corrupt the impartial functions of the court. *United States v. Buck*, 281 F.3d 1336; *accord Zurich N. Am. v. Matrix Serv.*, 426 F.3d 1281 (10th Cir. 2005).

iii.    ***SEC v. ESM Government Secur., Inc.***, **645 F.2d 310 (5th Cir. 1981)** primarily addresses the issue of abuse of process in the context of administrative investigations, particularly when fraud, deceit, or trickery is involved. "We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably." *Id. a*t 316. The Fifth Circuit held that such misconduct by a government agency could justify denying enforcement of an administrative subpoena. The court emphasized a case-by-case, totality-of-the-circumstances approach, considering factors such as the government's good faith and the harm caused by any unlawful conduct.

In summary, fraud on the court under Rule 60(d)(3) is designed to provide for relief where a judicial order has been obtained by intentional misconduct that directly corrupts the judicial process, such as witness or jury tampering or fabrication of evidence by attorneys. In combination with fraud upon the court, the SEC had a duty to behave honorably when working with the public. *ESM Gov. Sec.*, 645 F.2d 310.

### 1.    Intentional Misconduct by Officers of the Court:

Defendants restate all actions by Tenreiro and Suthammanont  and specifically note that at the time of the filing of the complaint, the memorandum in support of the TRO, the various

declarations and at the time of the hearing, Tenreiro and Suthammanont knew that the account where funds were transferred to on July 30 and July 31 was owned by Veritaseum, LLC, not Reggie Middleton.

Tenreiro and Suthammanont intentionally represented that account to be personal in order to create a sense of urgency to obtain the relief they desired – the asset freeze. This conduct was not unlike the pre-Wells behavior of the SEC: attempting to enforce a subpoena that hadn't been served; threatening subpoenas when a Formal Order of Investigation was not signed; attempting to impeach Mr. Middleton with a forged document; and refusing to provide updated enforcement manual modifications that would allow Defendants due process rights to be respected. This is intentional conduct. Further, after the complaint was filed and after the asset freeze obtained, attorneys for the SEC continued their behavior by using a brain damaged witness and intimidating affiants for the defense into silence.

### 2.    The Corruption of Judicial Integrity

Defendants restate all actions by Tenreiro and Suthammanont and specifically note that the Court relied on the statements by Tenreiro and Suthammanont, along with the supporting filings, that alleged investor funds were at risk of dissipation because Mr. Middleton,  in the days before the complaint and the requested freeze, transfered funds to his personal account.  Tenreiro knew during at the TRO hearing that Judge Hall relied specifically on this information in making her decision and knew the information to be false.  "So I don't have anything to balance their argument but to accept it as true…" Transcript p. 36 – Judge Hall when discussing the lack of information provided by Mr. Kornblau and specific reliance on Mr. Tenreiro upon making her decision.

The reliance on fraudulent statements when deciding to issue an asset freeze is a clear corruption of judicial integrity. A summary is provided:

Misreprespresentations Regarding the Kraken Account

| Document / Context | SEC's Representation | Page / ¶ | Impact |
|---|---|---|---|
| SEC Complaint | "ETH...flowed directly to an account in Middleton's name at a digital asset trading platform" | ¶116 | Misrepresents digital asset platform accounts are personal |
| SEC MEMO TRO | July 30th Middleton transferred 10,000 ETH to a personal account at a digital asset trading platform citing Doody Decl. ¶¶30-33. | p. 16 | Ties Kraken account identified in Doody's Declaration as a personal account supporting the dissipation claim |
| TRO Schedule A | Listed as "Veritaseum, LLC" (Account ending 5A7Q) | Sch. A, p.14 | **NB: This directly shows that the SEC had full knowledge that the account was corporate and not personal.** |
| TRO Hearing | Tenreiro does not inform Judge Hall that all filings represented the Kraken account as the personal dissipation account. | Tr. 39–40 | Failed the duty of candor under ABA Model 3.3. Directly lied to the court. Omitted material information from the court. Perpetuated the false dissipation narrative. |

In every document the SEC filed on August 12, 2019, save for the proposed order (D.E. 6), the SEC was emphatic that the Kraken account was the personal account of Mr. Middleton and that assets were dissipating resulting in harm to the alleged investors. They lied.

As D.E. 6 showed clearly, the SEC had the account number and account name of the only Kraken account listed to be frozen, as that of Veritaseum, LLC. A fact Doody's 2nd declaration confirmeded.

### 3.    Clear and Convincing Evidence of a Scheme

Defendants restate all actions by Tenreiro and Suthammanont and specifically note the consistent and persistent  actions, as stated in the intentional misconduct by officers of the court, beginning in August 2017 through the entry of D.E. 61. Statements, actions, threats, filings, and abuses of SEC authority and power to effectuate a single outcome, at any and all cost, of obtaining

the shutdown of Defendants operations. This is nearly the exact same *modis operandi* sanctioned

in the *DebtBox* case.

### 4.    Materially Affecting the Adjudication

Defendants restate all actions by Tenreiro and Suthammanont and specifically note it is

clear from Judge Hall's decision process in the TRO Hearing transcript that she relied on

Tenreiro's statements to the Court and the filings received. The SEC's misconduct directly

influenced the Final Judgment's $8,474,137 disgorgement and $1,000,000 penalty (D.E. 61 ¶

VII). The TRO's financial pressure (Transcript p. 12, lines 1-5) and witness intimidation (2024

affidavits) further materially corrupted the judicial process by crippling Defendants' defense

(D.E. 19 at 20-21), both by wrongly making exculpatory witness testimony unavailable and by

improperly freezing assets that Defendants otherwise could have used to prepare their defense.

*See  Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1086 (2016) (The government's interest

in securing funds for penalties or restitution, while important, does not outweigh the defendant's

fundamental right to counsel). These wrongful acts, in combination, materially corrupted the

judicial process by wrongly forcing Middleton's settlement (D.E. 61). Without this fraud,

litigation might have reduced or avoided the $9,474,137 total, reflecting truthful adjudication.

Any argument of immateriality by the SEC must fail, as the SEC's fraudulent statements,

omissions and improper witness tampering plainly and indisputably drove both the TRO and the

Defendants' decision to accept the settlement reflected in the final consent order (*Id.*).

### C.    Neither Laches Nor Settlement Bars Relief

Finally, the 5.5-year delay from October 31, 2019, to May 30, 2025, does not preclude

relief under FRCP 60(d)(3), which has no statute of limitations. *See United States v. Beggerly*, 524

U.S. 38 (1998); *Hazel-Atlas*, 322 U.S. at 244 "…[T]ampering with the administration of justice in

the manner indisputably shown here involves far more than an injury to a single litigation. It is a

wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, at 246.

The SEC will argue that because the parties settled the matter knowing of the fraud in this case, Defendants should be barred from vacating the judgment. There are two cases, both in the Ninth Circuit that specifically address this narrow area of law where parties settled and then later sought to vacate: *Pumphrey v. K.W. Thompson Tool Co. 62 F.3d 1128* (9th Cir. 1995) and *Sierra Pac. Indus. v. United States*, No. 15-15799 (9th Cir. 2017).

Under *Sierra,* related to the Moonlight Fire of 2007, the parties settled their dispute despite knowing of potential fraud by the United States which may or may not have fabricated evidence of the origin of the fire. Specifically in the settlement, the parties agreed that the facts may or may not be as they are or were known, but the parties agreed to settle regardless. The district court, and the 9th Circuit examined this settlement and acknowledged that *Sierra*, while fully aware of the facts, waived the fraud explicitly in its settlement agreement.

Under *Pumphrey*, a patent infringement case related to the "Gunslick" cleaning rod, including a claim after settlement for fraud upon the court under 60(d)3 claiming that the attorney for KWT (Defendant) had fabricated a video showing the "Gunslick" rod in use prior to the patent filing. The Ninth Circuit found that settlement is not an absolute bar when attorneys fabricate evidence which prevent the court from performing its impartial function citing *Hazel-Atlas*. The Ninth Circuit remanded to the district court to determine the fraud's scope and impact to determine if the fraud was sufficiently egregious.

## III.    CONCLUSION

The SEC's conduct in this case represents a profound betrayal of the judicial process warranting vacatur of the Final Judgment (D.E. 61) under Federal Rule of Civil Procedure

60(d)(3). Beginning in August of 2017, the SEC through Mr. Tenreiro, Ms. Szczepanic and Mr. Suthammanont executed a multi-faceted scheme that corrupted judicial integrity, breaching its dual obligations to avoid fraudulent schemes that deceive proceedings (*Hazel-Atlas*, 322 U.S. at 245) and to behave honorably (*ESM Government Securities, Inc.*, 645 F.2d at 317).

The SEC refused to provide procedural updates to its own enforcement manual to conceal the change in subpoena authority during investigations, threatened judicial enforcement of a subpoena that had not been served, attempted to authenticate a forged document, refused to cooperate or consider administrative solutions to avoid litigation even with a willing party, refused to reveal its theories of alleged fraud telling defendants to figure it out for themselves, filed fraudulent claims of personal account ownership and dissipation of funds to overseas locations outside of the jurisdiction of the SEC despite knowing the truth of the account ownership and the routine nature of the transactions which were in the normal course of business, and finally, after failing to correct or address any of these issues, when faced with litigation and their case falling apart, convinced a brain damaged man to file a declaration stating that he was an investor and threatened felony action against a witness if they didn't change their story to fit the SEC's narrative.

These actions, as a whole, perpetrated over two years, demonstrate 1) intentional misconduct by officers of the court; 2) that corrupted judicial integrity; 3) through clear and convincing evidence of a scheme; that 4) materially affected the adjudication. These actions, collectively, materially crippled Defendants' ability to defend the action, placing undue burden and denial of due process through the inability to have counsel of choice under the Sixth Amendment, resulting in the inability to continue defense after the Court seized the entirety of its assets.

Accordingly, Defendants respectfully move this Court to vacate the Final Judgment, restoring judicial integrity and reaffirming that the government must eschew deceitful schemes

and uphold honor, as demanded by *Hazel-Atlas* and *ESM Government Securities*, to protect private citizens like Reggie Middleton and the entity Defendants from such egregious misconduct. In the alternative, Defendants request an evidentiary hearing with reasonable and limited discovery so that the court may determine for itself the extent and nature of the egregious fraud.

Respectfully submitted,

**/s Franklin Jason Seibert**
Franklin Jason Seibert
Seibert Law
3202 Coral Ridge Dr
League City, TX 77573
971-235-5764
jason@seibert-law.com
*Counsel for Defendants*

May 30, 2025