

By ECF

The Honorable Vera M. Scanlon
United States District Court
Eastern District of New York 225
Cadman Plaza East Brooklyn, New York 11201

RE: SEC v. Reginald Middleton, et al., No. 19 Civ. 4625 (WFK) (VMS)
    Defendants' Reply to Plaintiff's Opposition to the Appointment of a Special Master
    Under Fed. R. Civ. Pro. 53

Dear Judge Scanlon:

    Defendants respond to Plaintiff's Opposition to the appointment of a Special Master (D.E. 161). Defendants raise two issues: 1) the Coinbase account does not comply with the Court's orders; and 2) Mr. Dewey fails to account for all of the assets in his declaration and failed to comply with Court Orders to submit invoices for approval prior to being paid. For these, and the following reasons, a Special Master should be appointed.

    A procedural reminder – all filings by Defendants related to the assets that constitute the CFAR, have been preliminary to making their objections to the Final Accounting. Defendants have not yet filed their Objections. Plaintiff, in DE 163, intimates that the funds should immediately be sent to Treasury and only if Defendants win on Appeal should the funds be ordered back. That would be procedurally inaccurate.

    For these and the following reasons, Defendants believe a Special Master is still the appropriate choice.

## A.  The Coinbase Account Does Not Comply

    The operative standards are the Court's own orders. The Preliminary Injunction requires the Court-appointed Independent Intermediary, within five days after receiving Defendants' digital assets, to certify that he provided the blockchain addresses, that Defendants transferred the digital assets, to provide a written description "by at least name and amount," and to certify that the assets "will be securely held in escrow pending further direction by the Court." (D.E. 51 § II(2)(2)). Dewey made that certification in D.E. 55. The same Order further requires that any applications for the Independent Intermediary's costs, fees, and expenses "shall be made to the Court, with notice to Defendants and an opportunity to be heard," describing such costs in reasonable detail. (D.E. 51 § II(2)(3)). These Court-ordered custody and accounting controls are the baseline against which compliance must be measured.

Plaintiff's contention is that a standard Coinbase exchange account is a "secure escrow account." The assertion is analogous to claiming that storing $15,000,000 USD of court-ordered money into a secure escrow account can be accomplished by placing those funds in a basic checking account at a local non-FDIC-insured bank. Plaintiff argues that this behavior is in full compliance with D.E. 61 (the "Order") and D.E. 51 (the "Preliminary Injunction"). Defendants disagree. Plaintiffs describe what amounts to constructive custody, when the order was for assets to be held "…in escrow pending further direction by the Court," which Defendants argue is *actual* custody.

i.    **Secure escrow standards are clear and were available.**

Secure escrow standards for digital assets are informed by regulatory frameworks like SEC Rule 206(4)-2 (the "Custody Rule") under the Investment Advisers Act of 1940 which emphasizes fiduciary protections, segregation, insurance, and risk mitigation to prevent dissipation or unauthorized access. These standards apply, by analogy, to court-appointed intermediaries like Dewey, who acted in a custodial capacity under D.E. 51.

Under SEC Rule 206(4)-2, advisers with custody of client assets (including digital assets treated as "funds or securities") must use a "qualified custodian" (e.g., a bank, broker-dealer, or trust company) to maintain assets in segregated accounts, ensuring bankruptcy remoteness and no commingling. Key requirements include: (1) holding assets with a qualified custodian in accounts titled for the client or adviser as agent/trustee; (2) direct quarterly statements from the custodian to clients; (3) annual surprise examinations by an independent accountant; and (4) reasonable belief that safeguards are in place, including comprehensive insurance against theft, breaches, and other losses.

As of July 2018, a full year prior to taking control of Defendants' assets, Coinbase Custody set the standard of custodial control of cryptocurrency in compliance with Rule 206(4)-2.[1] There should be an investigation into why Mr. Dewey would ignore Rule 206(4) compliant custodial services in favor of an uninsured comingled risk-ridden account over Defendants' objection. *See* Exhibit A (email expressing objection to storing funds at Gemini … Later, instead of Gemini and without notification, funds were stored in the generic Coinbase account).

ii.    **Mr. Dewey admitted he violated the Court order by affirming that the assets were, in fact, comingled.**

D.E. 51 and D.E. 61 mandated that digital assets be "securely held in escrow pending further direction of the Court" which implied  Rule 206(4)-2 standards of immutable, segregated holding in the provided addresses with full insurance and protections, not commingling in a basic account subject to risks.

---

[1] Coinbase Custody launched July 2, 2018.  https://www.coinbase.com/blog/coinbase-custody-is-officially-open-for-business

Dewey's Declaration explicitly admits, and exhibits attached to his declaration confirm that the funds were not held in a Coinbase Custody account. (D.E. 161-1) He describes the Coinbase setup as one where assets are "transfers and aggregates... via secondary transactions" (id at ¶ 8), treating them as fungible without proprietary claims to specific tokens, much like commingled bank deposits ( id at ¶ 9). This aggregation occurred immediately after deposit, as blockchain records for the dedicated addresses reveal outgoing sweeps in minutes or hours as previously raised by Defendants.

Coinbase's 2019-2020 crime policy (limited to $255 million for platform-wide hot wallet breaches), as applied to generic Coinbase accounts, explicitly excluded coverage for individual account compromises or non-theft losses. The Digital Assets were not FDIC-insured, leaving the holdings vulnerable to failures. Depending on the date, the commingled assets were valued between $8 million and $16 million USD, sitting in this uninsured location for nearly a year. By analogy, if these were Court-ordered frozen US Dollars, the Court would not have tolerated $15 million held in a non-FDIC insured, commingled basic checking account exposed to such risks.

Through transitive properties, if the Digital Assets were treated in this manner, how were the rest of the assets treated?

### B. Mr. Dewey Failed to Account for All Assets and Submit Invoices

Per D.E. 61 IX, Mr. Dewey was to submit a final invoice to Defendants for payment pursuant to the Court's Order dated August 26, 2019, and then present that invoice to the Court prior to payment per D.E. 51 ¶ II (3) for review for reasonableness.

Defendants shall pay, upon approval by the Court as set forth below, the reasonable costs, fees, and expenses of the Independent Intermediary, including, but not limited to, the reasonable costs, fees, and expenses … All applications for costs, fees, and expenses of the Independent Intermediary shall be made to the Court, with notice to Defendants and an opportunity to be heard, setting forth in reasonable detail the nature of such costs, fees, and expenses.
DE 51 ¶ II (3).

Per the CFAR, Mr. Dewey paid himself without filing the appropriate motions to the Court Per D.E. 61 (IX) through D.E. 51 (II)'s mandate. Per D.E. 61 XIII, "All payments will be reflected in the quarterly and final accountings referenced above…" Holland & Knight and Miller Kaplan were to be included in the accountings, quarterly and final and were not. They still are not. Defendants again assert that Mr. Dewey, Holland & Knight, RCB Services, and Miller Kaplan have submitted a single line bill for nearly $1 million in services with zero explanation. That would not be acceptable to the Court for an attorney fee application, and it is still not acceptable here. All parties that managed the fund were under court ordered obligation to file with the Court (or provide the SEC counsel to file)" costs and fees associated with the management of the Fund, in reasonable detail, for Court review and approval. D.E. 61. They did not.

Defendants believe that all information should be compiled prior to briefing objections to the accounting. The fact that the information is continuously excluded by Plaintiff and Mr. Dewey suggests they do not want the information to be known.

### C. The Impact of the Violations and Requested Relief

Defendants have shown that Digital Assets were mismanaged in violation of Court Order (D.E. 51 and 61). The Preliminary Injunction requires that all applications for the Independent Intermediary's costs, fees, and expenses be made to the Court. (D.E. 51 § II(2)(3)). Reviewing the docket entries, from D.E. 51 through the latest filings, there is no record of that application (or any motion to the Court); however, the CFAR shows that payments were made without motion and without court approval.

The Final Judgment imposed a non-discretionary liquidation scheme for the Frozen Metals: custody in a designated vault, sale overseen by the Independent Intermediary (with authority to retain a liquidation consultant), and transmission of all proceeds to the Commission. D.E. 61 § VIII. Yet the current record contains no liquidation materials from which the Court can verify that those steps occurred as ordered. In that posture, Defendants' questions—what metals were liquidated, through what process, at what prices and fees, and with what proceeds delivered—are not rhetorical; they are the minimum facts the Court must have to enforce its own Judgment. The record is still incomplete:

What happened to the gold and silver? What happened to the gold options? Where are the billing statement as required by D.E. 61 IX? How did Mr. Dewey pay himself without order of the Court? Were the expenses reasonable? What court oversite occurred prior to using the Fair Fund to enrich themselves? Why didn't the SEC enforce the requirements of the D.E. 61 which was their duty in overseeing the management of the Fund?

Accordingly, Defendants request the appointment of a Special Master (D.E. 158) to investigate the violation of Court Orders, conduct a full and thorough accounting of all matters related to assets from August 12, 2019, to the present date, and delay objections briefing until resolved.

Respectfully submitted,

/s/ Franklin Jason Seibert
Franklin Jason Seibert
Seibert Law
Pro Hac Vice (D.E. 103)
971-235-5764
jason@seibert-law.com

cc: all parties and counsel on the docket (via ECF)